**The CINCINNATI NEWSPAPER GUILD, LOCAL 9, The Newspaper Guild, AFL–CIO, CLC, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 90–1429.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 25, 1991.

Decided July 12, 1991.

David Jonathan Cohen, with whom David S. Barr was on the brief, Washington, D.C., for petitioner.

Linda Dreeben, Attorney, NLRB, with whom Aileen A. Armstrong, Deputy Associate General Counsel, NLRB, was on the brief, Washington, D.C., for respondent. Peter Winkler and Robert F. Mace, Attorneys, NLRB, also entered an appearance, Washington, D.C., for respondent.

Before MIKVA, Chief Judge, and D.H. GINSBURG, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

The National Labor Relations Board held that the Cincinnati Enquirer did not, by insisting upon unilateral control over wage increases, refuse to bargain in good faith with the Cincinnati Newspaper Guild, Local 9. *The Cincinnati Enquirer, Inc.*, 298 N.L.R.B. No. 41 (Apr. 24, 1990). As we conclude that the Board's decision was supported by substantial evidence and was consistent with the relevant Board and judicial precedents, we deny the Guild's petition for review.

## I. BACKGROUND

The Guild was certified as the bargaining representative of the Enquirer's editorial division employees after winning a Board-conducted election in December 1984. Previously, the employees had been represented by the Enquirer Editorial Employees Professional Association.

The last collective bargaining agreement between the Association and the Enquirer, which expired in February 1984, divided the bargaining unit employees among six classifications, each of which was in turn subdivided into several experience ratings. That agreement set out the minimum salary for each experience rating within each classification, and provided for annual increases in the minimum salary for each rating. (The Employer could give an individual employee a merit increase, above the applicable minimum, on its own initiative.) The agreement also included a union security clause, a no-strike clause, and a four-step grievance procedure culminating in arbitration.

When the Guild began bargaining with the Enquirer in April 1985, the Union proposed to retain the system of wage scales and job classifications. The Employer countered by proposing to eliminate wage scales and classifications, and to substitute a system of increases based exclusively upon merit, with no specified minima for new hires. The Enquirer also proposed to drop the arbitration provision, but to keep the no-strike clause.

The Guild and the Enquirer met regularly for bargaining sessions, but both sides adhered to the positions outlined above. In May 1986, the Employer finally stopped insisting upon a no-strike clause, but it continued its firm stand in favor of a merit increase system and against arbitration.

In June 1986, the Guild filed an unfair labor practice charge claiming that the Enquirer's positions on wages, arbitration, and the no-strike clause constituted surface bargaining in violation of National Labor Relations Act §§ 8(a)(1) (employer interference with employees' right, *inter alia,* "to bargain collectively through representatives of their own choosing") and 8(a)(5) (employer "refus[al] to bargain collectively with the representatives of his employees"). 29 U.S.C. §§ 158(a)(1), (5). *See* § 8(d), 29 U.S.C. § 158(d) (collective bargaining obligation includes requirement to bargain in good faith). The Regional Director of the NLRB first issued but then withdrew an unfair labor practice complaint. Upon the Guild's appeal, the General Counsel remanded the case to the Regional Director to reissue a complaint applying only to "the Employer's bargaining position pertaining to a merit wage system without minimum wages." In September 1987, the Regional Director issued a new complaint charging that the Enquirer had engaged in an unfair labor practice by in-

sisting, from April 1985 to the date of the complaint, "that the Union agree to a merit wage system with no minimum wage rates, administered exclusively by [the Employer]," and by insisting, from May 1985 to May 1986, "on a no-strike clause and no-arbitration clause in any collective bargaining agreement."

After a hearing, an Administrative Law Judge found that the Enquirer had not refused to bargain in good faith. At the beginning of the hearing, the ALJ struck the allegation that the Enquirer had violated the Act by insisting upon a no-strike clause in conjunction with a no-arbitration clause; in his view, the General Counsel had authorized the Regional Director to file a charge based solely upon the Employer's merit wage position. The ALJ then found that the Enquirer had indeed insisted upon unilateral control of wages, but he held, on the authority of *NLRB v. American National Insurance Co.*, 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027 (1952), that the Enquirer's bargaining position could not constitute a per se violation of the act. Although insistence upon a merit wage system in conjunction with a no-strike clause and no arbitration provision might be evidence of bad faith bargaining, he reasoned, an unfair labor practice finding requires some additional and independent evidence of bad faith.

The Board affirmed the ALJ's ultimate decision that the Employer did not commit an unfair labor practice, but slightly modified some of the ALJ's findings and reasoning. In the Board's view, the complaint rested upon

> [t]he General Counsel's theory ... that the [Enquirer's] insistence on its proposal for unilateral control of merit pay without reference to minimum wage standards, viewed in the context of its proposal that there be no arbitration of grievances and ... a no-strike clause ... constituted an insistence on unilateral control of all wages, and that this position, in and of itself, violated Section 8(a)(5).

*Id.*, slip op. at 1–2. Because the Board discerned no evidence that the Enquirer had insisted upon unilateral control of wage reductions or of the wages of newly hired employees, it found that the Enquirer insisted upon unilateral control only of merit increases, not of all wages. Thus the General Counsel had not proved the factual predicate of her legal theory, and the Board declined to find an unfair labor practice based only upon the Employer's insistence that it control merit increases.

The Board also reversed the ALJ's decision to strike part of the complaint, holding that the issuance of a complaint is a matter within the General Counsel's unreviewable discretion. *See NLRB v. United Food & Commercial Workers Union, Local 23*, 484 U.S. 112, 108 S.Ct. 413, 98 L.Ed.2d 429 (1987); *see also* §§ 3, 10, 29 U.S.C. §§ 153, 160. The Board found that error immaterial, however, because the General Counsel, like the Board, had interpreted the complaint to address the Enquirer's wage position in the context of the arbitration and no-strike clause positions, and was not hindered in presenting her case on that theory.

## II. ANALYSIS

Because the Board has "the primary responsibility of marking out the scope of the statutory language and of the statutory duty to bargain," *Ford Motor Co. v. NLRB*, 441 U.S. 488, 496, 99 S.Ct. 1842, 1848, 60 L.Ed.2d 420 (1979), this court defers to the Board's "reasonably defensible" construction of that duty. *Id.* at 497, 99 S.Ct. at 1849. *See also Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944). In addition, the court must uphold the Board's determination that the General Counsel has not met her burden of proving an unfair labor practice by the preponderance of the evidence, *see* § 10(c), 29 U.S.C. § 160(c), unless that determination has "no rational basis." *Teamsters Local Union No. 515 v. NLRB*, 906 F.2d 719, 727 (D.C.Cir.1990). This statement particularizes the general rule that the court will defer to Board findings of fact supported by "substantial evidence

on the record considered as a whole." § 10(f), 29 U.S.C. § 160(f). *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

## A. *The ALJ's Erroneous "Striking" of Allegations in the General Counsel's Complaint*

█ The Guild argues at the outset that the Board erred in finding immaterial the ALJ's purporting to strike the supposed allegation of a separate unfair labor practice grounded upon the Enquirer's simultaneous insistence that there be a no-strike clause and no arbitration. According to the Guild, the ALJ (and the Board) misunderstood the unfair labor practice complaint, with the result that the ALJ improperly excluded the Guild's evidence.

We agree with the Board that the ALJ's error was harmless. The ALJ agreed that the Employer's no arbitration/no-strike position might be relevant to the charge of an unfair labor practice based upon the Enquirer's insistence that it have control over wages. The General Counsel consistently treated the Enquirer's no-strike and no-arbitration positions in conjunction with its merit wage position; she never contended that the non-wage positions constituted a refusal to bargain in good faith apart, as counsel said at the hearing, from "the context with the[ ] proposals with respect to minimum wages and merit wages." The real source of the Guild's dismay is not the ALJ's ruling but the General Counsel's theory of the case.

The Guild claims that the ALJ's erroneous ruling led him to exclude evidence related to the Employer's no-strike and no-arbitration positions, but the Union does not point to anything in particular that was excluded. In making his ruling, the ALJ explained that he was not barring evidence of the Enquirer's insistence upon the arbitration and no-strike issues. In any event, the Enquirer admitted that it insisted, throughout the period charged in the complaint, that there be a no-strike clause but no provision for arbitration of grievances.

The only matter that the Union invokes to prop up its argument is the ALJ's comment, made after the Enquirer's admission, that he was "not going into the actual give and take on arbitration and no strike." He made that comment as he overruled the Enquirer's objection to the question, "[W]hat was said with respect to those three subjects, wages, arbitrations and strikes?" Indeed, the ALJ admitted virtually all of the Union's evidence related to those issues, often over the Employer's objection. (The only exclusion of which we are aware related to Union counsel's vague and cumulative query whether the no-strike position was "a part of the background" during other negotiations.) The General Counsel never objected to any evidentiary ruling, nor did she make any proffer of evidence that was apparently rendered irrelevant by the ALJ's ruling. As we find no reason to believe that the General Counsel was hampered in making her record, we reject the Guild's argument to the contrary.

## B. *The Extent of the Employer's Insistence Upon Unilateral Control of Wages*

█ Although the ALJ found that the Enquirer insisted upon the power unilaterally to determine all wages, the Board found that the General Counsel had proven only that the Enquirer insisted upon unilateral control of wage increases, as opposed to wage reductions or the initial wages of newly hired employees. The Guild claims that the Board's finding is not supported by substantial evidence. We disagree.

Throughout the bargaining process, the Guild insisted upon a comprehensive wage scale system for old and new employees alike. Although "there is some evidence that the [Enquirer's] initial wage proposal . . . contemplated unilateral control of new hires' wages," 298 N.L.R.B. No. 41, slip op. at 2, the Guild made no narrower counterproposal that might have isolated the Enquirer's supposed insistence upon unilateral control of the wages of new hires. As the Board noted, "the Union did not explicitly reject this aspect of the proposal, but sought only to obtain further information on this item." *Id.* at 2 n. 2. The Board

found that, instead, "the parties focused primarily on the Respondent's specific purpose to unilaterally control wage increases." *Id.* at 2. Nor do we find anything in the record to establish that the Enquirer was unwilling to yield on the issue of minimum salaries for new hires in exchange for a concession elsewhere. Accordingly we find that the Board rationally concluded that the General Counsel failed to carry her burden on this point.

The Enquirer's proposal never specifically addressed the possibility of wage reductions, and again the Guild did nothing to isolate and press the question whether the Employer was demanding the right unilaterally to reduce wages. In fact, the issue does not appear even to have been broached during bargaining. Consequently, we affirm the Board's finding that the General Counsel failed to carry her burden to establish that the Enquirer insisted upon unilateral control of wage reductions.

### C. *The Enquirer's Wage Proposal as a Refusal to Bargain in Good Faith*

█ The complaint in this case alleged that the Enquirer's negotiating position amounted to a refusal to bargain in good faith. The only indication of bad faith identified in the complaint was the Enquirer's bargaining position in favor of merit wages and a no-strike clause and against arbitration. When counsel for the General Counsel concluded his opening statement by explaining, "[I]t is our position ... that [the Enquirer's] insistence—the proposals they made with respect to wages, arbitration, and a strike, amounted to a per se refusal to bargain on their part," the ALJ specifically queried, "Per se?" The General Counsel confirmed the point: "Per se violative, because they were insisting on the unilateral right to determine employees' wages." It is frivolous for the Guild to contend, therefore, that the ALJ and the Board somehow erred in taking the General Counsel's theory of the case to be that the Enquirer's bargaining position amounted to a per se violation of the Act.

This should be the end of the matter, for the courts have held that the Act precludes almost any argument that a particular bargaining position constitutes an unfair labor practice per se. As the Board and the ALJ recognized in this case, the Supreme Court has long held that "the Board may not, either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements." *NLRB v. American Nat'l Ins. Co.*, 343 U.S. 395, 404, 72 S.Ct. 824, 829, 96 L.Ed. 1027 (1952), *quoted in The Cincinnati Enquirer, Inc.*, 298 N.L.R.B. No. 41, ALJ dec. at 6. In *American National* the Supreme Court refused to enforce a Board order forbidding an employer to insist upon "a provision whereby the [employer] reserves to itself the right to take unilateral action with respect to rates of pay, wages, hours of employment, and other terms and conditions of employment," *id.* 343 U.S. at 400 n. 5, 72 S.Ct. at 827 n. 5, a provision that the Board had treated as a per se refusal to bargain in good faith. The Court said:

> Whether a contract should contain a clause fixing standards for such matters as work scheduling or should provide for more flexible treatment of such matters is an issue for determination across the bargaining table, not by the Board.... [T]he extent of union and management participation in the administration of such matters is itself a condition of employment to be settled by bargaining.
>
> Accordingly, we reject the Board's holding that bargaining for the management functions clause proposed by respondent was, *per se*, an unfair labor practice.

*Id.* at 409, 72 S.Ct. at 832. *See also H.K. Porter Co. v. NLRB*, 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970) (reversing Board order that employer, which unquestionably failed to bargain in good faith, agree to dues check-off: "while the Board does have power ... to require employers and employees to negotiate, it is without power to compel a company or a union to agree to any substantive contractual provision of a collective bargaining agreement").

Even in the wake of *H.K. Porter*, though, the Board occasionally found that an employer's bargaining position amount-

ed to a per se refusal to bargain in good faith. The courts of appeals have been skeptical at best. *See, e.g., Struthers Wells Corp. v. NLRB,* 721 F.2d 465 (3d Cir.1983) (refusing to enforce Board order finding unfair labor practice in company's insistence upon merit pay and other contract proposals); *Tex–Tan Welhausen Co.,* 172 N.L.R.B. 851 (1968) (bargaining order), *enforced,* 419 F.2d 1265 (5th Cir.1969), *vacated & remanded,* 397 U.S. 819, 90 S.Ct. 1516, 25 L.Ed.2d 805 (for reconsideration in light of *H.K. Porter), enforced in part & enforcement denied in part,* 434 F.2d 405 (5th Cir.1970) (enforced with respect to employer bargaining misconduct, but not as to its insistence upon certain wage-related positions, which Board had treated as per se violations).

The Board now seems to have accepted the courts' repeated teaching that an employer's bargaining position is not itself bad faith but only evidence of bad faith, so that a finding of bad faith bargaining must be bolstered by additional evidence. In *Marina Associates,* 296 N.L.R.B. No. 147 (Oct. 5, 1989), the Board clearly established that even an employer's insistence upon total control over all wages can be "only one part of [a] pattern of conduct" on which the Board can base a finding of failure to bargain in good faith. *Id.,* slip op. at 1 n. 1. The pattern of employer conduct in that case included unilaterally changing the work schedule; misrepresenting and withholding information in bargaining; offering to institute a benefit system that would have discriminated against union members, openly and for that purpose; discouraging the union from accepting the employer's own offer; and proposing a merit wage system that would have excluded the union from the raise-setting procedure and made such wage decisions nongrievable. *See also Colorado–Ute Elec. Ass'n, Inc.,* 295 N.L.R.B. No. 67 (June 15, 1989) (employer may insist upon merit wage system in course of bargaining but may not "grant increases without consulting with the Union[ ]"), *pet. for review pending,* No. 89–9545 (10th Cir.); *S–B Mfg. Co.,* 270 N.L.R.B. 485 (1984) (across-the-board increase granted unilaterally after

impasse revealed "sham" nature of earlier insistence upon merit system). *Compare NLRB v. Blevins Popcorn Co.,* 659 F.2d 1173, 1187–88 (D.C.Cir.1981) (insistence upon harsh proposal may be evidence of bad faith) *with Teamsters Local Union No. 515 v. NLRB,* 906 F.2d 719, 727 (D.C. Cir.1990) ("Adamant insistence on a bargaining position ... is not itself a refusal to bargain in good faith.") (quoting *Chevron Oil Co., Standard Oil of Tex. Div. v. NLRB,* 442 F.2d 1067, 1072 (5th Cir.1971)).

Scrambling to support its argument that the Board may treat an employer's negotiating posture as bad faith bargaining per se—indeed that the court should compel such a finding—the Guild lights upon our recent decision in *Toledo Typographical Union No. 63 v. NLRB (Toledo Blade Co.),* 907 F.2d 1220 (D.C.Cir.1990). In *Toledo Blade* we held that an employer could not insist to impasse upon a clause that excluded the union from participation in direct dealing between the employer and individual employees on a significant compensation issue. That decision, however, was predicated on the employer's having insisted upon a non-mandatory subject of bargaining—namely, that the union agree to give up its right to act as the employees' bargaining representative in negotiations with the employer. Unlike the management rights clause at issue in *American National* or the merit increase proposal in this case, the proposal in *Toledo Blade* would have deprived the employees of their right to have their representative bargain for them over a mandatory subject, the terms of retirement and separation incentives. By "intrud[ing] into the relationship between the employees and their Union," the clause at issue in *Toledo Blade* interfered with the employees' right to bargain collectively. *Id.* at 1223. Although an employer might insist to impasse upon retaining unilateral authority to set certain terms and conditions of employment, we held that it could not "go to impasse over whether it has to deal with the union." *Id.* at 1224. *See A–1 King Size Sandwiches,* 265 N.L. R.B. 850 (1982), *enforced,* 732 F.2d 872 (11th Cir.1984) (refusal "to give the Union

any voice whatsoever concerning [several] mandatory subjects of bargaining").

In this case, the Enquirer insisted only upon (1) an individualized wage increase structure, (2) a no-strike clause (on which it later showed some willingness to move), and (3) restriction of the grievance system to a four-step negotiation process that culminated in bargaining with the editor of the Enquirer rather than in arbitration. Although the Enquirer certainly sought a greater role for itself, and a lesser role for the Union, with respect to employee compensation and the resolution of day-to-day disputes, the Employer did not propose to strip the Union of its collective bargaining function. The Enquirer was willing to negotiate with the Guild on the content of the merit pay plan, and to let the Guild represent any employee who wanted to challenge his proposed wage increase through the grievance procedure. These concessions would have preserved the Guild's role as the collective bargaining agent of its members, which is what distinguishes this case from *Toledo Blade*.

### III. CONCLUSION

Apart from its bargaining position, the complaint against the Enquirer alleged no action evidencing bad faith. Nor does the record disclose any other evidence that the Enquirer bargained in bad faith. The Board was clearly correct, therefore, in refusing to find that the Enquirer committed no unfair labor practice, and in rejecting the Guild's implicit argument that the NLRA requires an employer to accede to a union's demand for wage scales and job classifications. Accordingly, the petition for review is

*Denied.*