McCLATCHY NEWSPAPERS,
INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Northern California Newspaper Guild,
Local 52, Intervenor.

No. 96–1399; Consolidated
with No. 97–1111.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 16, 1997.

Decided Dec. 19, 1997.

Jeremy P. Sherman argued the cause and filed the briefs for petitioner.

David S. Habenstreit, Supervisory Attorney, National Labor Relations Board, argued the cause for respondent, with whom Linda R. Sher, Associate General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel, were on the brief.

James B. Coppess argued the cause for intervenor Northern California Newspaper Guild, Local 52, with whom Barbara Camens, Marsha S. Berzon, and Laurence S. Gold were on the brief.

Gerard C. Smetana was on the brief for amicus curiae Council on Labor Law Equality.

Before: SILBERMAN, ROGERS, and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

This dispute encompasses two cases, one involving McClatchy's Sacramento newspaper and the other its Modesto newspaper. In both cases, the National Labor Relations Board found that McClatchy committed an unfair labor practice by unilaterally implementing a discretionary merit pay proposal, even though McClatchy had bargained to impasse over the proposal with the union. In the Modesto case, the Board also found that McClatchy had threatened its employees with discharge for engaging in a protected activity. McClatchy petitions for review of the orders, and the Board cross-petitions for enforcement. We enforce the Board's Sacramento order, and partially enforce the Board's Modesto order.

## I.

At the Sacramento Bee, the Northern California Newspaper Guild, Local 52 represents editorial, advertising, and telephone switchboard employees. McClatchy's most recent collective bargaining agreement with the union, which expired in 1986, set pay through a combination of wage scales and discretionary merit raises. The agreement defined 28 job classifications, each setting a minimum salary that automatically increased with each year of experience. Once an employee reached the maximum salary for his or her classification, raises were based solely on merit, as determined by the company. McClatchy retained full discretion over the timing and amount of these merit raises, and its decisions were excluded from the contractual grievance and arbitration procedure. Within 10 days of performing a merit evaluation, McClatchy would notify the union of the result, and the union then could make nonbinding comments and participate in the appeals process at the employee's request.

When the 1986 agreement expired, McClatchy and the union each proposed a new wage system. From the outset, their proposals were diametrically opposed: McClatchy wanted to move to a system based entirely on its determination of merit; the union wanted to eliminate the merit system altogether. McClatchy's final offer proposed to grandfather current employees earning less than their classification's maximum, but this plan only superficially preserved the old wage scales. Ninety percent

of the employees were already at the top salary step in their class, so the offer kept most raises in McClatchy's complete discretion. And, since the 1986 scales were out of step with the cost of living, salaries for the remaining 10% would effectively be determined by the publisher's discretion as well.

The parties bargained in good faith, but ultimately deadlocked over wage terms for the new agreement. Following impasse, McClatchy asserted that it was implementing its final offer and began granting increases to employees without consulting the union. Under the terms of McClatchy's proposal—as was true under the 1986 agreement—the union's role was restricted to making nonbinding comments and participating in the appeal process only if asked by the employee. The union filed an unfair labor practice charge against McClatchy, alleging that implementing "merit" increases without the union's consent violated McClatchy's duty to bargain with the union over wages.

Before the Board resolved the union's Sacramento complaint, petitioner reached an impasse with the union over a similar discretionary pay proposal for its Modesto Bee editorial staff. The only difference in the Modesto proposal was that it fixed the timing of merit increases. At the Sacramento Bee, McClatchy could consider employees for increases as frequently or infrequently as it wished, but at the Modesto Bee, increases were tied to the annual review process. As it had in Sacramento, petitioner implemented its final offer after impasse and gave raises to some employees. The union filed a second unfair labor practice charge against McClatchy, and included an allegation that McClatchy had threatened the Modesto employees with discharge for engaging in protected activity. Petitioner had posted a copy of its final offer, with a cover memorandum noting that, in the absence of agreement, the final offer set the terms and conditions of employment. Because the posted offer included a no-strike/no-picketing clause, the union complained that the posting was a veiled threat to employees.

The Board considered the Sacramento case first. The General Counsel argued that because McClatchy had a statutory obligation to bargain over "wages, hours, and terms of employment," granting individual raises without consulting the union violated the National Labor Relations Act. McClatchy maintained that it had satisfied that duty by bargaining to impasse over the discretionary pay proposal. Once it had exhausted the bargaining process by reaching impasse, McClatchy asserted, it was privileged to implement its "last, best, and final offer" over the union's objection. Relying on its decision in Colorado–Ute Electric Association, 295 N.L.R.B. No. 67, 1989 WL 224193 (1989), enf. denied, 939 F.2d 1392 (10th Cir.1991), the Board rejected McClatchy's defense. In the Board's view, this case was less about impasse than statutory waiver: an employer who proposes unlimited management discretion over wages is really proposing that the union waive its statutory right to be consulted about wage changes. That is fine, the Board reasoned—if the union agrees. But impasse, by definition a lack of agreement, could not substitute for consent. Without a waiver, nothing relieved McClatchy of its obligation to bargain with the union before changing any employee's pay; unilaterally granting merit increases, therefore, was an unfair labor practice. McClatchy Newspapers, Publisher of The Sacramento Bee, 299 N.L.R.B. No. 156, 1990 WL 155359 (1990).

The Board petitioned for enforcement of its order. The majority of the court, in a per curiam opinion, held that the Board's decision did not constitute reasoned decisionmaking. NLRB v. McClatchy Newspapers, Inc., 964 F.2d 1153 (D.C.Cir.1992). The three judges wrote separate opinions, however, each expressing a somewhat different view of the Board's approach. Judge Henderson essentially agreed with the Tenth Circuit's view, expressed in Colorado–Ute, that the Board simply could not square its approach with governing precedent under the NLRA. Judge Silberman thought that the issue the Board faced was novel and that the Board's waiver theory might well be a legitimate interpretation of the Act if adequately explained. Chief Judge Edwards believed that the Board's waiver theory would not work, but that it might be possible to articulate a limited exception to the impasse doctrine

that would cover this situation. He pointed out that the employer's bypassing the union in setting wage rates could be seen as a kind of de-collectivization of bargaining. *Id.* at 1173. Chief Judge Edwards and Judge Silberman agreed to remand to the Board for further consideration; Judge Henderson would have simply denied enforcement.

On remand, although it still used some language redolent of its original waiver theory,[1] the Board essentially adopted Chief Judge Edwards' suggestion and fashioned an exception to the implementation after impasse doctrine. The Board explained that although the doctrine "is designed, in part, to allow an employer to exert unilateral economic force .... [it is legitimate] only as a method for breaking the impasse." *McClatchy Newspapers, Publishers of The Sacramento Bee,* 321 N.L.R.B. No. 174 at 4, 1996 WL 506086 (1996) (*McClatchy II*). In other words, the Board grounded its new "narrow exception" on the impact that implementation would have on the collective bargaining *process:*

> Were we to allow the Respondent here to implement its merit wage increase proposal and thereafter expect the parties to resume negotiations for a new collective-bargaining agreement, it is apparent that during the subsequent negotiations the Guild would be unable to bargain knowledgeably and thus have any impact on the present determination of unit employee wage rates. The Guild also would be unable to explain to its represented employees how any intervening changes in wages were formulated, given the Respondent's retention of discretion over all aspects of these increases. Further, the Respondent's implementation of this proposal would not create any fixed, objective status quo as to the level of wage rates, because the Respondent's proposal for a standardless practice of granting raises would allow recurring, unpredictable altera-

tions of wages [sic] rates and would allow the Respondent to initially set and repeatedly change the standards, criteria, and timing of these increases. The frequency, extent, and basis for these wage changes would be governed only by the Respondent's exercise of its discretion.

*Id.* at 6. Echoing Chief Judge Edwards' de-collectivization remark, the decision noted that petitioner's "ongoing ability to exercise its economic force in setting wage increases [without the Guild's participation] ... would simultaneously disparage the Guild by showing ... its incapacity to act as the employees' representative in setting terms and conditions of employment." *Id.* The Board took pains to emphasize that its holding was limited to a case where an employer refused to state any "definable objective procedures and criteria" for determining merit. *Id.* It decided the Modesto case by the same reasoning and also found that petitioner had threatened the Modesto employees by posting its final offer, which had included the no-strike clause. *McClatchy Newspapers, Publisher of The Modesto Bee,* 322 N.L.R.B. No. 135 (1996).

Petitioner criticizes the Board for not adhering to portions of the three separate opinions of the judges on the prior panel, or in not answering all of the questions posed by those judges, but it should be understood that only the *per curiam* opinion is the court's holding. The Board's analysis does rely on observations made in the judges' opinions, and the Board adopted Chief Judge Edwards' suggestion. Its decision, however, must be judged on its own bottom—not on whether it conforms in whole or in part to the views of individual judges.

## II.

■ Although the parties agree the case is one in which petitioner unilaterally implemented the terms of its final offers, it does

---

1. "In sum, it is not the Respondent's bargaining proposal that we view as inimical to the policies of the Act, but its exclusion of the Guild at the point of its implementation of the merit pay plan from any meaningful bargaining as to the procedures and criteria governing the merit pay plan, *when the Guild has not agreed to relinquish its statutory role."* *McClatchy Newspapers, Inc., Publishers of Sacramento Bee,* 321 N.L.R.B. No. 174 at 6, 1996 WL 506086 (1996) (emphasis added).

seem somewhat anomalous to refer to the institution of the new wage regime as an "implementation of terms." Essentially, these wage proposals—particularly the one for the Sacramento Bee—have no terms. Indeed, the Board's opinion expresses the tentative view that under *NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), "a wholly discretionary merit wage policy (*i.e.*, without identifiable procedures and criteria) does not itself 'establish' terms and conditions of employment at any point *prior* to the actual exercise of this discretion in setting discrete wage rates for unit employees." *McClatchy II* at 6 n. 24 (emphasis added). In other words, the Board questioned whether the impasse doctrine should even apply to the employer's action. We think there is something to this query, but since it is not the Board's holding, we obviously cannot rely on it in reviewing the Board's decision.

Although petitioner's argument is somewhat diffuse, we detect three lines of attack against the Board's order. The first is that the NLRA—or at least its "settled doctrine"—contemplates that an employer will be able to implement its last offer to the union after impasse; thus, the argument goes, the Board either lacked authority to craft the "narrow exception" applied in this case or was arbitrary and capricious in doing so. Second, petitioner claims that the Board implicitly treats its merit pay proposal as a permissive bargaining subject, despite the Supreme Court's recognition that comparable management discretion clauses are mandatory subjects of bargaining. Finally, the Board is accused of inadequately setting forth the boundaries of the exception it has crafted and insufficiently reconciling its own precedent.

\* \* \* \* \* \*

The NLRA is wholly silent on the question whether an employer may implement its final offer after impasse. To be sure, the general language of the Act, including § 8(a)(5) and

§ 8(d), have been authoritatively interpreted by the Supreme Court, and the Board is not free under *Chevron* to alter any of the those interpretations even if they otherwise would be permissible readings of the Act. *See Lechmere, Inc. v. NLRB*, 502 U.S. 527, 536–37, 112 S.Ct. 841, 847–48, 117 L.Ed.2d 79 (1992); *Maislin Indus. v. Primary Steel, Inc.*, 497 U.S. 116, 131, 110 S.Ct. 2759, 2768–69, 111 L.Ed.2d 94 (1990). But the Supreme Court, while it has recognized the Board's doctrine, has never held that an employer has the *right* under the statute to implement its final offer, let alone considered whether the Board is entitled to craft exceptions to this supposed right.[2] Indeed, not even the Board has ever held that the NLRA *requires* this rule.

The Board argues, moreover, that its decision does not create the only exception to the rule. It contends, and petitioner does not dispute, that other clauses—dues checkoff, union security, no-strike, and arbitration clauses—could not be implemented unilaterally post-impasse. Insofar as dues check-off and union security clauses are exceptions to the post-impasse rule, however, it is not because the Board has authority to treat them as such; rather, the NLRA requires that these clauses be exceptions, because they are legal only if authorized by a collective bargaining agreement. *See* 29 U.S.C. § 158(a)(3) (1994). As for arbitration clauses, it would seem that just as a union cannot force an employer to arbitrate after an agreement has expired, an employer cannot force a union to arbitrate when no agreement has been reached. *See generally Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991). But that proposition, if true, appears to rest not so much on a Board-crafted exception to the post-impasse rule, but rather on general principles of contract interpretation under § 301 of the Labor Management Relations Act. *See Litton*, 501 U.S. at 203–04, 111 S.Ct. at 2223–24; *see also* 29 U.S.C. § 171(b)

---

2. *See Brown v. Pro Football, Inc.*, 518 U.S. 231, 116 S.Ct. 2116, 135 L.Ed.2d 521 (1996); *Laborers Health & Welfare Trust Fund for N. Cal. v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 544 n. 5, 108 S.Ct. 830, 833 n. 5, 98 L.Ed.2d 936 (1988); *Charles D. Bonanno Linen Serv. v. NLRB*, 454 U.S. 404, 102 S.Ct. 720, 70 L.Ed.2d 656 (1982); *NLRB v. Katz*, 369 U.S. 736, 745 n. 12, 82 S.Ct. 1107, 1113 n. 12, 8 L.Ed.2d 230 (1962); *NLRB v. Crompton–Highland Mills, Inc.*, 337 U.S. 217, 224, 69 S.Ct. 960, 963, 93 L.Ed. 1320 (1949).

(1994) (the United States encourages *voluntary* arbitration).

The Board's treatment of no-strike conditions, on the other hand, is somewhat more analogous. The Board has held that because the right to strike is "fundamental," it cannot be relinquished by employees except by consent—which implies a specific contractual waiver. *Gary–Hobart Water Corp.*, 210 N.L.R.B. No. 87 at 744, 1974 WL 5037 (1974). It follows, therefore—although the Board has never expressly so held—that an employer could not impose no-strike conditions post-impasse even if embodied in its final contract proposal. It will be recalled that the Board's *McClatchy II* decision still has fragments of its original waiver theory, and the Board's description of wages as of "paramount" concern is certainly akin to its description of the right to strike as "fundamental." And, if the Board's conclusory waiver rationale as applied to no-strike conditions were ever challenged, it would surely say, as it has in these cases, that a unilateral imposition of a no-strike condition would also impair the *process* of collective bargaining—without the right to strike, the union's future bargaining position would be devastated.

Even if the Board has never before determined that an exception to its doctrine was warranted, however, it is not clear that the statute prevents it from doing so in this case. Petitioner argues that this exception is inconsistent with *NLRB v. Insurance Agents' International Union, AFL–CIO*, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960), which forbids the Board to act "as an arbiter of the sort of economic weapons the parties can use in seeking to gain acceptance of their bargaining demands." *Id.* at 497, 80 S.Ct. at 431. But the Supreme Court, in *Charles D. Bonanno Linen Service v. NLRB*, 454 U.S. 404, 102 S.Ct. 720, 70 L.Ed.2d 656 (1982), has also emphasized that the Board has wide latitude to monitor the bargaining process. There, bargaining between the union and a multi-employer bargaining unit had reached impasse. The union selectively struck Bo-

nanno Linen and attempted to reach secret interim agreements with some of the other employers. This "whipsaw" technique was designed to force a presumably stronger employer like Bonanno Linen to yield to the union's demands, carrying the rest of the unit with it and ending the impasse. In response, however, Bonanno Linen replaced striking workers and notified both the union and the other employers that it was withdrawing from the bargaining unit. The Board held that a bargaining impasse, even when combined with a selective strike and the specter of interim agreements, was not an "unusual circumstance" justifying an employer's unilateral withdrawal from the unit. An employer can only withdraw if it is subject to extreme financial pressures or if the bargaining unit has become substantially fragmented. *Id.* at 411, 102 S.Ct. at 724–25. In the Board's view, giving an individual employer the ability to withdraw at impasse would threaten the stability of multi-employer bargaining units, because dissatisfied employers could walk away instead of working out differences. *Id.* at 412 n. 8, 102 S.Ct. at 725 n. 8.

The Supreme Court deferred to the Board's "rule," notwithstanding strong dissents arguing that the Board had unfairly tied the hands of employers. As one pair of dissenters protested, "With one or more competitors fully back in business, the ability of the remaining employers to resist the union demands becomes greatly—and unfairly—diminished." *Id.* at 422, 102 S.Ct. at 730 (Burger, C.J., dissenting). The majority did not dispute that the Board's decision reduced the struck employer's bargaining power—but the majority, as opposed to the dissenters, did not think this necessarily beyond the Board's reach. In *Insurance Agents'*, the Board had held that the union's use of slowdowns, sit-ins, leafleting, and picketing was a *per se* violation of its obligation to bargain in good faith under § 8(b)(3), the union counterpart to § 8(a)(5).[3] In reversing, the Court emphasized that the Board had taken an

---

**3.** *Insurance Agents'*, 361 U.S. at 482, 80 S.Ct. at 423. Of course, a union's tactics, no matter how troubling or even independently unlawful, are always designed to reach a collective bargaining agreement. An employer, on the other hand,

may well wish to break the union. Neither the Board nor the Supreme Court has mentioned this asymmetrical factor, but it may have affected decisions.

erroneous view of collective bargaining, a system in which good-faith bargaining and economic weapons must coexist. *Id.* at 489, 80 S.Ct. at 427. But the Court also noted that while economic pressure is not itself inconsistent with § 8(b)(3), the "unique character" of particular tactics might be inconsistent with collective bargaining. *Id.* at 488, 80 S.Ct. at 426–27. In keeping with this point, the Court in *Bonanno Linen* concluded that the Board could "deny an employer a particular economic weapon ... in the interest of the proper and pre-eminent goal, maintaining the stability of the multi-employer bargaining unit." *Bonanno Linen,* 454 U.S. at 419, 102 S.Ct. at 728–29.

■ Thus it is true, as petitioner stresses, that *Insurance Agents'* prohibited the Board from "act[ing] at large in equalizing disparities of bargaining power between employer and union." *Insurance Agents',* 361 U.S. at 490, 80 S.Ct. at 428. But it is also true, as *Bonanno Linen* makes apparent, that regulating the process of collective bargaining may involve the Board in making determinations that necessarily implicate—if they do not rest directly on—the Board's appraisal of conditions that will affect the parties' bargaining power. Although the line between economic neutrality and authority over process is exceedingly difficult to draw, we think that this case is marginally closer to *Bonanno Linen* than to *Insurance Agents'.* Here, as in *Bonanno Linen,* the Board has denied the employer a particular economic tactic for the sake of preserving the stability of the collective bargaining process.

The post-impasse rule itself regulates process through power. The Board has told us that its rationale for permitting an employer to unilaterally implement its final offer after impasse is that such an action breaks the impasse and therefore encourages future collective bargaining.[4] The theory might well be thought somewhat strained, for it does not

explain why the Board decided to handle impasse with this rule instead of another. The Board could have adopted, for example, a rule requiring the status quo to remain in effect until either the union or the employer was willing to resume negotiations. Stagnancy might pressure both the employer and the union to bend. But the rule it did choose—allowing the employer to implement its final offer—moves the process forward by giving one party, the employer, economic leverage. And in this case, where the employer has advanced no substantive criteria for its merit pay proposal, the Board has decided that the economic power it has granted would go too far. Rather than merely pressuring the union, implementation might well irreparably undermine its ability to bargain. Since the union could not know what criteria, if any, petitioner was using to award individual salary increases, it could not bargain against those standards; instead, it faced a discretionary cloud. As the Board put it, "the present case represents a blueprint for how an employer might effectively undermine the bargaining process while at the same time claiming that it was not acting to circumvent its statutory bargaining obligation." *McClatchy II* at 6. We think that it is within the Board's authority to prevent this development:

> [T]he Board, employing its expertise in the light of experience, has sought to balance the 'conflicting legitimate interests' in pursuit of the 'national policy of promoting labor peace through strengthened collective bargaining.' The Board might have struck a different *balance* from the one it has, and it may be that some or all of us would prefer that it had done so. *But assessing the significance of impasse and the dynamics of collective bargaining is precisely the kind of judgment that Buffalo Linen ruled should be left to the Board.*

---

4. We can find, however, no "seminal case" setting forth the Board's rationale underlying the impasse rule. *Cf.* Ellen J. Dannin, *Collective Bargaining Impasse and Implementation of Final Offers: Have We Created a Right Unaccompanied by Fulfillment?* 19 U. ToL. L. Rev. 41, 44 n.7 (1987). *Taft Broadcasting Co.,* 163 N.L.R.B. No. 55 (1967), *enf. sub nom. AFTRA v. NLRB,* 395

F.2d 622 (D.C.Cir.1968), is usually cited as the prime case, but *Taft* assumes the existence of the rule and goes on to list criteria for determining whether impasse has been reached in good-faith. The cases that best describe the Board's rationale are *Hi–Way Billboards, Inc.,* 206 N.L.R.B. No. 1, 1973 WL 4443 (1973) and *Bi–Rite Foods, Inc.,* 147 N.L.R.B. No. 11 (1964).

*Bonanno Linen,* 454 U.S. at 413, 102 S.Ct. at 725 (emphasis added) (citations omitted). Of course, if relative bargaining strength were not a matter that the Board could consider in determining whether petitioner's action furthered the collective bargaining process, the Board's reasoning would be vulnerable. But that is not how we read *Bonanno Linen.*

Not only does an employer's implementation of a proposal such as petitioner's deprive the union of "purchase" in pursuing future negotiations, the Board also concluded that by excluding the union from the process by which individual rates of pay are set petitioner "simultaneously disparag[ed] the Guild by showing ... its incapacity to act as the employees' representative in setting terms and conditions of employment." *McClatchy II* at 6. It knew no specifics about the merit raises, therefore it had no information to relay. In that regard, the Board echoed concerns expressed in Chief Judge Edwards' prior concurring opinion that petitioner's implementation of its proposal could be seen as seeking de-collectivization of bargaining.[5] The Board concluded that petitioner's action was "so *inherently* destructive of the fundamental principles of collective bargaining that it could not be sanctioned as part of a doctrine created to break impasse and restore active collective bargaining." *McClatchy II* at 6 (citations omitted). Petitioner particularly objects to this passage, arguing that the phrase "inherently destructive"—which, as the Board acknowledges, comes from *NLRB v. Great Dane Trailers,* 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967)—applies only to employer behavior that is claimed to violate § 8(a)(3), the anti-discrimination provision of the Act. But the Board explained that it was using the term only to show that, as in *Great Dane,* the employer's action will have "foreseeable consequences" notwithstanding its motive. We do not see why that observation is independently objectionable.

\* \* \* \* \* \*

Nevertheless, petitioner contends that the Board's logic is inconsistent with *NLRB v. American National Insurance,* 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027 (1952), which held that a clause giving an employer discretion over "management functions" such as promotions, discipline and work scheduling is a mandatory subject of bargaining—*i.e.,* one on which an employer is entitled to insist to the point of impasse. The Court there said that the Board is not entitled to "sit in judgment upon the substantive terms of collective bargaining agreements," *id.* at 404, 72 S.Ct. at 829, and petitioner asserts that the Board is doing just that in this case. The Board, petitioner argues, has really based its entire reasoning on its judgment about the substance of petitioner's pay proposal.

It seems to us that petitioner may well overread *American National Insurance.* The Court there dealt with a management functions clause that was traditional in the insurance industry. Can one imagine employee's pay—in *any* industry—being described as a subject of a *management functions* clause? And the Court held only that "[a]ny fears the Board may entertain that use of management functions clauses will lead to *evasion* of an employer's duty to bargain collectively as to 'rates of pay, wages, hours, and conditions of employment' do not justify condemning all bargaining for management functions clauses concerning *any* 'condition of employment'...." *Id.* at 409, 72 S.Ct. at 832 (emphasis added). We rather doubt that *American National Insurance* means that no employer proposal could be condemned as a *per se* indication of bad faith bargaining. Suppose, for instance, an

---

**5.** De-collectivization concerns are related to concerns about direct dealing, although direct dealing is not itself at issue in this case. In *Toledo Typographical Union No. 63 v. NLRB,* 907 F.2d 1220 (D.C.Cir.1990), the court, reversing the Board, held that a proposal for direct employer-employee negotiations over retirement buyouts was a permissive subject upon which an employer could not insist to impasse. *The Board has not, however, applied Toledo Blade* to proposals that preserve some role for the union as bargaining agent. In *Cincinnati Newspaper Guild, Local 9 v. NLRB,* 938 F.2d 284 (D.C.Cir.1991), the court upheld the Board's determination that an employer committed no unfair labor practice by insisting to impasse on a unilateral merit pay plan because the plan allowed the union to participate in the grievance procedure. The Board seems to have followed *Cincinnati Newspaper Guild* in this case, and it has not been suggested that McClatchy's merit pay plan was a permissive subject.

employer proposed that all working conditions, including wages and hours, were to be determined in accordance with the employer's total discretion. The offered agreement would have just three clauses: (1) union recognition, (2) the employer's discretion over all terms, and (3) a no-strike clause. That would seem to be the paradigm management functions clause "evading" the employer's collective bargaining duty.

In any event, the Board did not hold, as it did in *American National Insurance*, that petitioner's insistence on its pay proposal was a permissive subject of bargaining; petitioner was therefore entitled to insist on it to impasse. Petitioner claims, however, that by declaring its "implementation" after impasse illegal the Board has done indirectly what it could not do directly. If an employer cannot implement its proposal then the union has a permanent "veto," *see Colorado–Ute Elec. Ass'n v. NLRB*, 939 F.2d 1392, 1404 (10th Cir.1991), which, it is argued, is simply another way for the Board to treat an employer's insistence on the proposal as illegal. Petitioner's argument has a good deal of force, but it does not quite carry the day. As the Board's counsel pointed out, the two steps of bargaining to impasse and implementing after impasse are not practically equivalent and therefore can be judged according to different standards. If a party can force an impasse over a subject, its authority to do so gives it significant leverage over all other matters. That ability is not lost—at least not totally—by the Board's holding that the same proposal may not be unilaterally implemented after impasse.

Admittedly, an employer in this situation is somewhat "stuck" on its wage proposal. Normal labor market pressures presumably will require it to increase salaries. (But as we noted earlier, the stalemate could pressure the union as well. *See supra* at p. 1032.) It can, of course, bargain *ad hoc* with the union as to each increase, but transaction costs might (or might not) make that infeasible. We cannot visualize exactly how various scenarios would play out—and it is not our job to do so; it is the Board's authority over the "dynamics of collective bargaining" to which we must defer. It is important to recognize, however, that the Board's decision does not prevent an employer from implementing a merit pay proposal post-impasse—so long as the proposal defines "merit" with objective criteria.

The Board's conclusion that petitioner may not unilaterally implement its proposal certainly draws from the substance of that proposal. But that is not unprecedented. To some degree, the Board often considers substance when regulating process. The Board must look to the content of a proposal to decide whether a subject is mandatory or permissive under § 8(d). *See NLRB v. Wooster Div. of Borg–Warner Corp.*, 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958).[6] As petitioner itself concedes, the Board may consider the content of a proposal when making a determination whether the employer is engaged in "surface bargaining." *See, e.g., NLRB v. Pacific Grinding Wheel Co.*, 572 F.2d 1343, 1348 (9th Cir.1978). Here, as in those instances, the Board's reliance on substance is not the same as "compelling McClatchy to agree to a proposal." *See* 29 U.S.C. § 158(d).

The Tenth Circuit, in *Colorado–Ute*, strongly suggests a contrary view. Relying on *American National Insurance*, it said that the employer had a "right" to use the "economic weapon of implementing at impasse" and that "this right exists irrespective of the parties' bargaining positions."*Colorado–Ute*, 939 F.2d at 1404. But the case before the Tenth Circuit rested on the Board's initial waiver theory that we too rejected. The Board did not rely in *Colorado–Ute* on its authority under *Bonanno Linen* to "assess[ ] the significance of impasse and the dynamics of collective bargaining." *See Bonanno Linen*, 454 U.S. at 413, 102 S.Ct. at 725. The Tenth Circuit thus did not actually decide the precise issue before us; its opinion does not even mention *Bonanno Linen.* Moreover,*Colorado–Ute* may be dis-

---

6. Indeed, Justice Harlan dissented in *Borg–Warner* primarily because he thought that categorizing bargaining subjects involved the Board too much in the substance of the proposal. The majority of the Court, however, did not think this inconsistent with either *American National Insurance* or the Act itself.

tinguishable even under the Board's new rationale. The Tenth Circuit was under the impression that the merit increases limited the employer's discretion to the extent that they were linked to the identifiable criteria of "job performance" and "contribution on the job."[7]

\* \* \* \* \* \*

Finally, petitioner argues that the Board has not explained adequately why it is making an exception for a proposal that affords an employer complete discretion over the grounds for and timing of wage increases. Petitioner asks, why are wages to be thought different than hours or other working conditions the statute also treats as mandatory subjects of bargaining? The Board explained that wages are "a key term and condition of employment and a primary basis of negotiations," *McClatchy II* at 6. That proposition, drawn perforce from the Board's expertise, seems hard to challenge in a reviewing court. The Board also thought its conclusion that wages were of "paramount importance" was supported by the wording of § 8(d), which lists wages first before hours and working conditions as subjects for collective bargaining. It does seem that the order—particularly when one considers that wages are, after all, a working condition and are nonetheless separately mentioned—is a legitimate point, if only a make-weight.

Admittedly, the Board's explanation as to why wages would be treated differently than, let us say, the decisions covered by the management functions clause in *American National Insurance*, is hardly a full one; it is surely not as extensive as the judges on the prior panel had wished. Nevertheless, we recognize the issue is analytically difficult and appreciate the Board's desire to proceed cautiously. Perhaps any hard and fast boundary drawing will force the Board prematurely to decide legal policy issues; agencies are entitled, just as courts, to proceed

case by case. *Stereo Broadcasters, Inc. v. FCC*, 652 F.2d 1026, 1031 (D.C.Cir.1981). We think the Board is free to draw on its expertise to determine that wages are typically of paramount importance in collective bargaining and to suggest that wages, unlike scheduling or a host of other decisions generally thought closely tied to management operations, are expected to be set bilaterally in a collective bargaining relationship.[8]

Petitioner also claims that the Board inadequately explained its deviation from its reasoning in prior cases. But the Board simply overruled portions of those decisions inconsistent with its reasoning in this case. Agencies are entitled to do just that.

### III.

Section 8(a)(1) of the Act makes it an unfair labor practice for an employer to "interfere with, restrain or coerce" employees in the exercise of the rights guaranteed by § 7 of the Act. 29 U.S.C. § 158(a)(1) (1994). The Board found that McClatchy threatened its Modesto Bee employees with discharge in violation of § 8(a)(1) by posting its final offer, which included a no-strike/no-picketing clause. Petitioner claims, however, that both the Amended Complaint and the hearing before the ALJ focused only on whether McClatchy had an "affirmative duty to explain" the nonbinding nature of the no-strike clause rather than on whether the posting "threatened" the employees. Therefore, petitioner argues, the charge violates its due process rights because "[t]he Board may not make findings or order remedies on violations not charged in the General Counsel's complaint or litigated in the subsequent hearing." *NLRB v. Blake Constr. Co.*, 663 F.2d 272, 279 (D.C.Cir.1981). We think that McClatchy is splitting hairs. The Amended Complaint described the posting of the no-strike provision and alleged that McClatchy

7. Our reading of the Board's decision in *Colorado-Ute*, however, suggests that "merit" pay was as substantively standardless there as here. *Colorado-Ute Elec. Ass'n*, 295 N.L.R.B. No. 67 (1989). Colorado-Ute's proposal did limit the employer's discretion *as to amount*, because increases were granted within a fixed range of progression steps. *Id.*

8. We think the Board also has the authority to decide that having fixed standards as well as fixed timing for considering raises is necessary if an employer wishes to implement its proposal. Thus we find no fault with the Board's decision to treat the Modesto and Sacramento proposals identically, even though Modesto had fixed timing.

failed "[to give] notice to employees that a no-strike proposal as described therein is not enforceable in the absence of a binding contract between the parties, and that, without such a binding contract, employees were free to strike." It is hard to say that petitioner was not on notice that the General Counsel thought the posting misled the employees into thinking that McClatchy would fire them for striking. Why would there be a question of McClatchy's clarifying the notice if it caused no confusion? Even assuming that this pleading is not specific enough, however, due process is satisfied if the issue is "fairly tried by the parties." Petitioner relies on *Blake Construction,* but there, although the General Counsel never alleged that the Company's treatment of non-union employees amounted to a violation of § 8(a)(1) or (5), the Board found an unfair labor practice on that ground. Here, the General Counsel alleged from the beginning that the posting violated § 8(a)(1); both the "affirmative duty to inform" and the "threatening" theories focused on same portion of the statute and the same set of facts. Granted, the General Counsel slightly shifted his legal theory after the hearing, but McClatchy has not argued that it would have litigated the issue differently at the hearing had it faced the "threatening" theory. To the contrary, petitioner has used the same arguments to counter both theories: that the union notified the employees of their rights and that McClatchy took no retaliatory action when employees picketed. The issue was thus "fairly tried."

 We nevertheless agree with petitioner that the § 8(a)(1) violation is not supported by substantial evidence. In evaluating an employer's conduct under § 8(a)(1), the Board must consider "whether the conduct in question had a reasonable tendency in the totality of the circumstances to intimidate." *NLRB v. Nueva Eng'g, Inc.,* 761 F.2d 961, 965 (4th Cir.1985) (quoting *Corrie Corp. v. NLRB,* 375 F.2d 149, 153 (4th Cir.1967)). In this case, the circumstances raise such a weak inference of intimidation that it is an intolerable stretch to say that substantial evidence supports it. The no-strike clause, which was buried in the document as "subsection 23.1," stated:

*During the term of this Agreement* the Guild and its agents will not cause, permit, condone, encourage, or sanction and no employee or employees of the Publisher will participate or engage in any strike.... Any employee or employees covered by this Agreement engaging in any such activity shall be subject to immediate discharge as said misconduct shall constitute just cause for discharge under this Contract.

(emphasis added). In characterizing the posting as a threat, the ALJ relied on what he described as the "negative pregnant" of the offer's cover page, which noted that "the Publisher reserves the right not to apply any provision of these terms and conditions that depends upon the existence of a binding contract between the parties for enforceability." This wording, the ALJ thought, implied that McClatchy had the authority to enforce the no-strike clause if it so wished. Other language in the posting, however, cuts against this strained inference. The no-strike clause itself began by saying it was enforceable "[d]uring the term of this Agreement," and the memorandum accompanying the posted offer emphasized several times that the Company and the union had "been unable to reach agreement" and that there was "no contract." The union represents educated employees who work in the editorial department. No evidence in the record suggests that these employees did not understand that the no-strike clause only applied during an agreement. Indeed, the employees picketed, suggesting that they felt no threat. We decline to enforce this portion of the Board's order.

\* \* \* \* \* \*

This case presents a difficult question because of the tension between the Supreme Court decisions bearing on the Board's limited exception to the post-impasse rule. We certainly understand how Board members can come to different conclusions—witness member Cohen's dissent. *McClatchy II* at 7. The question is even more difficult for us as a reviewing court, and we are obliged to admit that we are unsure ourselves as to the right answer. Under those circumstances, we think the appropriate course, keeping in

mind the Board's "primary responsibility for developing and applying national labor policy," *Chamber of Commerce v. Reich,* 74 F.3d 1322, 1334 (D.C.Cir.1996) (quoting *NLRB v. Curtin–Matheson Scientific, Inc.,* 494 U.S. 775, 786, 110 S.Ct. 1542, 1549, 108 L.Ed.2d 801 (1990)), is to defer to the Board's interpretation of the Act.