# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 7, 2007      Decided January 29, 2008

No. 06-1338

MAIL CONTRACTORS OF AMERICA,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

Consolidated with
06-1380

On Petition for Review and Cross-Application for
Enforcement
of an Order of the National Labor Relations Board

*Jeffrey W. Pagano* argued the cause for petitioner. With him on the briefs was *Herbert I. Meyer*.

*Kira Dellinger Vol*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Ronald E. Meisburg*, General Counsel, *John H. Ferguson*, Associate General Counsel, and *Julie B. Broido*, Supervisory Attorney. *Fred B. Jacob*, Attorney, entered an appearance.

Before: GINSBURG, *Chief Judge*, and TATEL and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GINSBURG.

GINSBURG, *Chief Judge*:  The National Labor Relations Board held Mail Contractors of America violated its duty to bargain with a union when, following an impasse in negotiations, it unilaterally changed a "relay point" on one of its trucking routes.  We grant MCA's petition for review of the Board's order and deny the Board's cross-application for enforcement.

## I. Background

MCA primarily transports bulk mail for the United States Postal Service among its 17 terminals nationwide.  The American Postal Workers Union, Des Moines Area Local, represents approximately 90 employees who work for MCA at the Urbandale, Iowa terminal.  In 2001, the Union and MCA negotiated a new collective bargaining agreement (CBA) for Urbandale, which agreement expired in September 2003.

Because MCA's terminals are far apart, its trucks are typically driven to and from "relay points" between terminals, where one driver turns the truck over to another who takes the truck on toward its destination.  The 2001 Urbandale CBA contained a management rights clause providing that the Company had "the right ... to decide the location of its terminal(s) and relay points" without further bargaining.  While the 2001 CBA was in effect, MCA switched relay points serving the Urbandale terminal six times.  It did so five times to satisfy the needs of the USPS or to comply with new regulations issued

by the Department of Transportation and once at the request of the Union. Because compensation is determined by hours spent driving, the location of a relay point may affect the compensation of the drivers who serve that relay point. Each time the Company changed a relay point, it first bargained with the Union even though, under the CBA, it was not required to do so.

After the CBA expired in 2003, the Union and MCA reached a tentative new agreement for Urbandale that again included a clause providing management retained the right unilaterally to change the location of relay points. The tentative agreement also included a new "bumping" provision, which gave any driver whose run was changed in such a way that his compensation decreased by 15% or more the right to take over a more junior driver's run. In September 2004, when negotiations reached an impasse rather than a final agreement, MCA lawfully implemented its final offer, including the provisions of the tentative agreement.

In March 2005 the Urbandale drivers struck. When one driver refused an order to drive to the relay point in York, Nebraska, MCA moved the relay point about 50 miles east along Interstate 80 to Havelock, Nebraska, where it had more resources. It did not give the Union notice of this change, although the striking workers were, of course, aware the Company was not using the York relay point. The effect of the change was that the drivers who drove from Urbandale to Havelock drove less and therefore earned less than they had earned prior to the strike, and the drivers who drove from Havelock to the next relay point drove more and therefore earned more than they had done prior to the strike. Because no driver's compensation decreased by 15%, however, the change did not trigger the bumping provision.

After the strike ended, MCA decided to keep the I-80 relay point at Havelock. Certain employees protested, but MCA refused to negotiate with the Union over the change.

The Union filed an unfair labor practice charge with the National Labor Relations Board and the General Counsel issued a complaint against MCA for refusing to bargain, in violation of Sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 185(a)(1) and (5). After a hearing, an Administrative Law Judge held MCA had indeed violated the Act by unilaterally changing the relay point.

The ALJ first found the change to the relay point materially affected employees' wages and working conditions, and was therefore a mandatory subject of bargaining. *See Mail Contractors of Am.*, 347 N.L.R.B. No. 88, at 6 (2006) (*MCA*). He acknowledged that under the expired CBA management had the right to change relay points without bargaining, but noted that under Board precedent, the Union's waiver of the right to bargain presumptively expired when the CBA expired. *Id.* Although the parties had tentatively agreed to a new contract that included a similar management rights clause, the ALJ noted they had never come to a final agreement. *Id.* at 6-7.

Next, the ALJ rejected MCA's argument that the management rights clause in its final offer gave it the right unilaterally to move the relay point. He acknowledged that the parties had reached an impasse in negotiations, which would ordinarily entitle the employer to implement its final offer. Applying the Board's decision in *McClatchy Newspapers, Inc.*, 321 N.L.R.B. 1386 (1996), *enf'd*, 131 F.3d 1026 (D.C. Cir. 1997), however, he concluded MCA could not lawfully implement the management rights clause because it granted MCA unlimited discretion to determine the location of relay points, and thereby to affect the wages and hours of employees. *MCA*, 347 N.L.R.B. No. 88, at 7. The ALJ also rejected MCA's

alternative contention that unilaterally changing the relay point was permissible as the continuation of a practice that had developed under the expired contract. Although the 2001 CBA contained a clause granting MCA discretion unilaterally to change relay points, MCA had never actually done so while that agreement was in force. *Id.* at 7-8.

The ALJ concluded that because neither post-impasse implementation of the final offer nor the past practice of the parties gave MCA the right to move a relay point, MCA's failure to bargain with the Union, after the strike had ended, over the move to Havelock from York was an unfair labor practice. *Id.* at 8. Accordingly, he ordered MCA to move the relay point back to York and pay back wages to the drivers whose routes had been shortened. *Id.* at 9.

MCA filed exceptions with the Board, a panel of which unanimously affirmed the findings and conclusions of the ALJ. *Id.* at 1 & nn.1-2. Two Members, relying upon *McClatchy*, voted to affirm because "the unilateral change had a direct effect on wages." *Id.* at 1 n.2. Chairman Battista reasoned more narrowly that under the 2001 contract the Company gave the Union advance notice of any relay point change, and "[t]here is no evidence that a change in this past practice was contemplated by the newly implemented management-rights clause." *Id.*

## II. Analysis

MCA argues, among other things, that the Board erred in concluding the Company was not entitled to implement the relay point provision when negotiations with the Union had reached an impasse. Because we agree and grant the petition upon that basis, we have no occasion to reach MCA's other arguments.

A. Standard of review

We apply a deferential standard of review to orders of the Board, which has "considerable authority to interpret the ... [Act]. If the Board adopts a rule that is rational and consistent with the Act, then the rule is entitled to deference from the courts." *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 42 (1987) (citation omitted). We will, however, set aside an order "when the Board has failed to apply the proper legal standard ... or when it [has departed] from established precedent without reasoned justification." *Titanium Metals Corp. v. NLRB*, 392 F.3d 439, 446 (D.C. Cir. 2004).

B. Implementation after impasse

Section 8 of the Act requires an employer to bargain with the union representing its employees with respect to "wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(a), (d). When a CBA expires without a new agreement having been reached, the employer must continue to bargain in good faith for a new agreement and maintain the status quo during negotiations. *See NLRB v. Katz*, 369 U.S. 736, 743, 746 (1962).

The duty to bargain does not, however, "compel either party to agree to a proposal or require the making of a concession." 29 U.S.C. § 158(d). The Act "does not contemplate that unions will always be secure and able to achieve agreement even when their economic position is weak." *H.K. Porter Co., Inc. v. NLRB*, 397 U.S. 99, 109 (1970). The Board is charged only with ensuring the parties satisfy their duty to bargain; it may not "act at large in equalizing disparities of bargaining power between employer and union." *NLRB v. Ins. Agents' Int'l Union*, 361 U.S. 477, 490 (1960). Nor may the Board impose a substantive provision upon the parties. "[A]greement may in some cases be impossible, and it was never intended that the Government

would in such cases step in, become a party to the negotiations and impose its own views of a desirable settlement." *H.K. Porter*, 397 U.S. at 103-04.

Either party to collective bargaining may lawfully insist to the point of impasse upon any provision related to a "mandatory subject of bargaining," which is to say "wages, hours, [or] other terms and conditions of employment." *See* 29 U.S.C. § 158(d); *NLRB v. Wooster Div. of Borg-Warner Corp.*, 356 U.S. 342, 349 (1958). An employer may even insist upon a provision granting it discretion unilaterally to change certain conditions of employment during the term of the CBA. *NLRB v. Am. Nat'l Ins. Co.*, 343 U.S. 395, 409 (1952) ("Whether a contract should contain a clause fixing standards for such matters as work scheduling or should provide for more flexible treatment is an issue for determination across the bargaining table, not by the Board").

When an employer and a union reach an impasse over a mandatory subject of bargaining, either side may resort to economic warfare – a strike, a lockout, etc. – and "the employer's statutory duty to maintain the status quo during postcontract negotiations ... end[s]." *Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co., Inc.*, 484 U.S. 539, 543 n.5 (1988). The employer then may "mak[e] unilateral changes that are reasonably comprehended within his preimpasse proposals." *Am. Fed'n of Television & Radio Artists v. NLRB*, 395 F.2d 622, 624 (D.C. Cir. 1968) (internal quotation mark omitted). The rationale for this rule is that the employer's unilateral imposition of the final offer "breaks the impasse and therefore encourages future collective bargaining." *McClatchy Newspapers, Inc. v. NLRB*, 131 F.3d 1026, 1032 (D.C. Cir. 1997). It "moves the process forward by giving one party, the employer, economic leverage." *Id.*

An employer's right to deploy its economic weapons

following an impasse is not absolute:  The Supreme Court has held the Board, in order to facilitate the process of collective bargaining, may place certain restrictions upon what an employer may do after impasse. In *Charles D. Bonanno Linen Service, Inc. v. NLRB*, 454 U.S. 404 (1982), for example, the Court upheld a Board order barring an employer from withdrawing from a multi-employer unit after bargaining had reached an impasse.  *Id.* at 412.  The Court stated more generally that the Board may "deny an employer a particular economic weapon ... in the interest of the proper and pre-eminent goal, maintaining the stability of the multiemployer bargaining unit." *Id.* at 419; *see also NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 32 (1967) (upholding Board decision prohibiting employer from granting benefits to strike-breakers but not strikers because of "discouraging effect on ... future concerted activity"); *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 231 (1963) (upholding Board decision prohibiting employer from granting super-seniority to strike-breakers because "[s]uper-seniority renders future bargaining difficult, if not impossible"); *cf. Am. Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 309 (1965) (holding lockout was not unfair labor practice because "the employer's intention was [not] to destroy or frustrate the process of collective bargaining").

C.  The *McClatchy* doctrine

In *McClatchy Newspapers*, 299 N.L.R.B. 1045 (1990) (*McClatchy I*), the Board announced a new exception to the implementation-after-impasse rule, again in order to facilitate post-impasse bargaining.  In that case the employer, after an impasse in negotiations, implemented its proposed merit pay system, which gave it almost complete discretion to determine wages.  Initially the Board held the employer had committed an unfair labor practice because the union had not "waived" its right to bargain over wages.  *Id.* at 1046-47.  This court found the Board's explanation inconsistent with Board precedent,

granted the employer's petition for review, and remanded the case for the Board to give a more adequate account of its position. *NLRB v. McClatchy Newspapers, Inc.*, 964 F.2d 1153, 1153-54 (D.C. Cir. 1992) (per curiam) (*McClatchy II*).  In separate concurring opinions, Judges Edwards and Silberman proposed a variety of alternative theories upon which the Board might justify its result.  Among them was Judge Edwards's theory that "a unilateral, discretionary merit pay scheme ... may pose a substantial threat to the union's role as the employees' representatives."  *Id.* at 1172.  He explained:

> If ... the employer can make unconstrained wage adjustments, the futility of union representation may be driven home to each employee in much the same way the unilateral change doctrine seeks to avoid.  Admittedly, the unilateral change doctrine generally presumes that implementing changes post-impasse does not hurt collective bargaining.  But if the employer can indefinitely adjust employee wages ... impasse will no longer be [a] "temporary" phenomenon ....  Where the employer has the unconstrained authority to adjust wages to respond to changing conditions, it will have substantially smaller incentives to restart collective bargaining.

*Id.* at 1172-73 (footnote omitted).

On remand, the Board again held the employer had committed an unfair labor practice, essentially adopting Judge Edwards's rationale.  *See McClatchy Newspapers, Inc.*, 321 N.L.R.B. 1386, 1390-91 (1996) (*McClatchy III*) ("[C]arte blanche authority over wage increases" would be "inherently destructive of the fundamental principles of collective bargaining") (emphasis and footnote omitted).  If the employer had complete discretion to set wages, the Board explained, then the union would be unable to participate knowledgeably in further bargaining.  *Id.* at 1391.  Moreover, the merit pay

provision would "disparage the [union] by showing, despite its resistance to this proposal, its incapacity to act as the employees' representative in setting terms and conditions of employment." *Id.* Emphasizing the "paramount importance of wages as a mandatory subject of bargaining," *id.* at 1391 n.22, the Board concluded the provision was "inimical to the policies of the Act" because it excluded the union "from any meaningful bargaining as to the procedures and criteria governing the merit pay plan." *Id.* at 1391.

McClatchy again petitioned for review, and this time we enforced the Board's order. *McClatchy Newspapers, Inc. v. NLRB*, 131 F.3d 1026 (D.C. Cir. 1997) (*McClatchy IV*). Citing *Bonanno Linen*, we noted that "the Board has wide latitude to monitor the bargaining process." *Id.* at 1031. We deferred to the Board's opinion that the provision at issue might "irreparably undermine [the union's] ability to bargain. Since the union could not know what criteria, if any, petitioner was using to award individual salary increases, it could not bargain against those standards; instead, it faced a discretionary cloud." *Id.* at 1032. We also accepted the Board's rationale that the union would appear impotent to its members if it had no information to relay. *Id.* at 1033. Recognizing the principle of *Insurance Agents* that the Board may not "act at large in equalizing disparities of bargaining power between employer and union," *id.* (quoting *Insurance Agents*, 361 U.S. at 490) (alteration and internal quotation marks omitted), we concluded "this case is marginally closer to *Bonanno Linen*"; "as in *Bonanno Linen*, the Board has denied the employer a particular economic tactic for the sake of preserving the stability of the collective bargaining process." *Id.* Most important for purposes of the present case, we noted the Board had confined its decision to provisions governing wages because wages are "a key term and condition of employment and a primary basis of negotiations," *id.* at 1035 (internal quotation marks omitted). We concluded:

> [T]he Board is free to draw on its expertise to determine that wages are typically of paramount importance in collective bargaining and to suggest that wages, unlike scheduling or a host of other decisions generally thought closely tied to management operations, are expected to be set bilaterally in a collective bargaining relationship.

*Id*.

The Board has since held employers ran afoul of the rule in *McClatchy* in four cases, three of which involved wage provisions. We approved the Board's application of *McClatchy* to a wage provision that gave "unfettered discretion to the employers at every stage of the pay determination process," *Anderson Enters.*, 329 N.L.R.B. 760 (1999), *enf'd*, 2 Fed. App'x 1, 3 (2001), but vacated an order in which the Board applied *McClatchy* to a relatively nondiscretionary unilateral wage provision. *Detroit Newspaper Agency*, 326 N.L.R.B. 700 (1998), *vacated sub nom. Detroit Typographical Union No. 18 v. NLRB*, 216 F.3d 109, 118 (2000). The First Circuit vacated the third Board decision, which concerned a provision giving an employer the discretion either to pay a predefined wage or to abide by "current marketplace pay practices," and remanded the case for further consideration. *See Edward S. Quirk Co., Inc.*, 330 N.L.R.B. 917 (2000), *vacated and remanded*, 241 F.3d 41, 45 (2001) ("*McClatchy* is based on employer discretion and discretion is a matter of degree, implicating policy judgments informed by Board expertise. However ... the Board owes the employer and a reviewing court ... a reasoned explanation of where it draws the line ...."), *reinstated*, 340 N.L.R.B. 301, 301-02 (2003). In the fourth case, which was not reviewed by any court, the Board applied *McClatchy* to a highly discretionary provision involving health benefits. *KSM Indus., Inc.*, 336 N.L.R.B. 133, 135 (2001), *modified in part*, 337 N.L.R.B. 987 (2002).

D. The relay point change

As recounted above, the Board held MCA ran afoul of *McClatchy* when it unilaterally imposed a provision reserving the right to change relay points. That decision was arbitrary and capricious for three reasons. First, the management rights provision at issue is utterly unlike the provision in *McClatchy* or the provision at issue in any subsequent case to which the Board has applied *McClatchy*. Second, it is inconceivable the provision will jeopardize collective bargaining in the affected unit – the stated concern underlying *McClatchy*. Finally, the Board's decision here would impinge upon the employer's ability to run its business more severely than did *McClatchy* itself or any of its sequellae.

*First*. The Board's decision is inconsistent with both the plain terms and the reasoning of *McClatchy*, which was based upon and limited by the "paramount importance of wages as a mandatory subject of bargaining." 321 N.L.R.B. at 1391 n.22. We expressly predicated our approval of the Board's decision upon the distinction between wages and "scheduling or a host of other decisions generally thought closely tied to management operations." 131 F.3d at 1035. Indeed, the Board has consistently limited its application of *McClatchy* to provisions giving an employer discretion to determine wages (or, in one case, benefits) rather than discretion to configure "management operations" – until this case.

The placement of a relay point is a quintessentially managerial decision; its location presumably will affect the efficiency of the Company's operations but it will have no material effect upon the Company's wage bill. If, as a result of changing a relay point, some drivers lose work, then other drivers gain as much work; meanwhile, the bumping provision that MCA implemented as part of its final offer prevents

management from manipulating relay points to give significantly more hours to less senior drivers.

The Board contends the placement of a relay point is nonetheless subject to the *McClatchy* doctrine because it will have a "direct effect on wages." *MCA*, 347 N.L.R.B. No. 88, at 1 n.2. The effect is no more significant, however, than the effect of any management decision about the scheduling of work or its allocation among plants or shifts. *Cf. Clinton's Ditch Coop. Co., Inc. v. NLRB*, 778 F.2d 132, 135, 140 (2d Cir. 1985) (management's right to change drivers' assignments had only "indirect, limited connection to ... any ... aspect of labor relations"). In *McClatchy IV* we deferred to the Board's view that wages are such a fundamental subject of collective bargaining that they are uniquely "expected to be set bilaterally in a collective bargaining relationship." 131 F.3d at 1035. The placement of a relay point, with its incidental effect upon wages, simply is not comparable.

*Second.* Neither of the pragmatic reasons for the Board's holding in *McClatchy* applies to this case: If an employer could unilaterally set wages, then the union (1) would be "unable to bargain knowledgeably" and (2) would appear impotent to its members because of its "incapacity to act as the employees' representative in setting terms and conditions of employment." *McClatchy III*, 321 N.L.R.B. at 1391. As to the former, management's change in the location of a relay point did not preclude "meaningful bargaining as to the procedures and criteria governing" wages, *id.*; nor, because wage rates and other terms of employment were fixed in nondiscretionary provisions of the final offer, did the change require the Union to bargain against a "discretionary cloud." *McClatchy IV*, 131 F.3d at 1032.

As for threatening to render the Union impotent and collective bargaining pointless in the eyes of employees, as

applied here the idea is fanciful. The change in the relay point at issue here, like each of the six changes MCA made during the two year term of the 2001 CBA, was made in response to an unexpected event. Having moved the relay point merely in order to keep trucks rolling during the strike, the Company then found it was more efficient to retain the new location. As the strike-induced move illustrates, the events that prompt the Company to change a relay point are both sporadic and sufficiently unexpected that the parties could not realistically have addressed them in the CBA; accordingly, management's reservation of the right to respond to them posed no realistic threat to the process of collective bargaining. Were it otherwise, the Union would not have agreed to the management rights clause in the 2001 CBA. More significant, with the benefit of experience under that agreement, the Union tentatively agreed to the clause again in the 2003 bargaining for a new agreement; indeed, the bargaining history shows the Union was concerned not with eliminating management's right to move relay points but with adding a more robust bumping provision in order to protect more senior drivers from any significant loss of work when a relay point is changed.

*Third.* The Board's decision impedes the employer's ability after impasse to implement its final offer to a far greater extent than had any prior decision. Bear in mind that in *McClatchy* itself the employer was prohibited only from implementing a system in which it would have determined wages on a purely discretionary basis; nothing in that decision bars an employer from implementing a final offer in which wages are determined according to fixed criteria. In this case, the ALJ correctly noted the management rights provision at issue left MCA with complete discretion to move relay points, *MCA*, 347 N.L.R.B. No. 88, at 7, but neither the ALJ nor the Union ever suggested there might be fixed criteria MCA could have offered and then implemented after impasse to govern the placement of relay points. Nor does that seem feasible for, as we have seen, relay

points, unlike wages, are changed in response to infrequent and exogenous events. In other words, because no nondiscretionary provision appears possible, the Board's decision would effectively preclude MCA from ever changing a relay point after impasse. That would be both anomalous, considering that MCA was free unilaterally to implement provisions regarding more fundamental subjects of bargaining, *see, e.g.*, *E.I. du Pont de Nemours & Co.*, 346 N.L.R.B. No. 55, at 11-12 (2006) (permitting unilateral imposition of nondiscretionary health care plan), *enf'd*, 489 F.3d 1310, 1320 (D.C. Cir. 2007), and inconsistent with the narrow exception in *McClatchy* to the general rule allowing the employer to implement its final offer after impasse.

The ALJ justified the application of *McClatchy* to this case as follows:

> Section 8(d) of the Act requires the parties to bargain over "wages and hours." It would undermine this specific statutory mandate if an employer could relegate to itself the discretion to determine [relay points after impasse]. In addition, to allow an employer to do so unjustifiably affects the balance of power between labor and management and thereby undermines an important goal of the Act of encouraging the parties to reach a collective-bargaining agreement. This is so because ... if an employer can relegate to itself this discretion a union's bargaining strength is diminished and the likelihood of reaching an agreement is decreased.

347 N.L.R.B. No. 88, at 7.

The ALJ's analysis is in effect a broadside attack upon the implementation-after-impasse doctrine. His concern that an employer would undermine the statutory mandate to bargain by unilaterally implementing its final offer after impasse overlooks

the very purpose of the doctrine, which is to "break[] the impasse and therefore encourage[] future collective bargaining ... by giving one party, the employer, economic leverage." *McClatchy IV*, 131 F.3d at 1032. His other point – that unilateral implementation means the union could no longer "seek concessions from the employer" in return for its agreement, *MCA*, 347 N.L.R.B. No. 88, at 7 – ignores the Supreme Court's teaching that it is not the Board's role to "equalize[e] disparities of bargaining power between employer and union." *Insurance Agents*, 361 U.S. at 490.

In affirming the ALJ, the Board rather limply stated only that "here, as in *McClatchy*, the unilateral change had a direct effect on wages," *MCA*, 347 N.L.R.B. No. 88, at 1 n.2, without any more particularized examination of the significance of that effect. The Board gave no reason to believe the relay point provision here at issue would impede collective bargaining. Therefore, we think it necessary to reiterate a point we made in *McClatchy IV*: The Board must proceed cautiously in applying the *McClatchy* doctrine, taking care to tether its applications to the pragmatic justification for that decision, namely, to facilitate the process of collective bargaining.

## III. Conclusion

For the reasons set out above, we hold MCA, after collective bargaining had reached an impasse, lawfully relocated its relay point to Havelock from York pursuant to the management rights provision of its final offer. Therefore, it did not commit an unfair labor practice when, after the strike ended, it kept the relay point at Havelock without first bargaining with the Union. Accordingly, the petition for review is granted and the Board's cross-application for enforcement is denied.

*So ordered.*