# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued January 17, 2012            Decided March 2, 2012

No. 10-1406

COMAU, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with No. 10-1409

———

On Petition for Review and
Cross-Application for Enforcement
of an Order of the National Labor Relations Board

———

*Thomas G. Kienbaum* argued the cause for the petitioner. *Theodore R. Opperwall* and *Noel D. Massie* were on brief.

*David Seid*, Attorney, National Labor Relations Board, argued the cause for the respondent. *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Ruth E. Burdick*, Supervisory Attorney, were on brief.

Before: HENDERSON, TATEL and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Petitioner Comau, Inc. (Comau) seeks review of a decision of the National Labor Relations Board (NLRB, Board) affirming the finding of an administrative law judge (ALJ) that Comau committed an unfair labor practice (ULP) in violation of section 8(a)(1) and (5) of the National Labor Relations Act (Act), 29 U.S.C. § 158(a)(1), (5). *See Comau, Inc.*, 356 N.L.R.B. No. 21, 2010 WL 4622509 (Nov. 5, 2010). The Board filed a cross-application for enforcement. For the reasons set forth below, we grant Comau's petition and vacate the Board's finding that Comau committed a ULP by unilaterally changing its employees' healthcare benefits.

**I.**

Headquartered outside Detroit, Michigan, Comau designs and builds automated assembly lines and specialty tools for the automobile industry.[1] Over 200 of Comau's employees are represented by the Automated Systems Workers Local 1123 (Union, ASW).[2] The most recent collective bargaining agreement between Comau and the Union ran from March 7, 2005 through March 2, 2008. On the expiration date, the parties had not reached a new agreement but they agreed to extend the former contract's terms indefinitely until a successor contract was agreed to. The extension was terminable on 14 days' written notice by either party.

Between January 2008 and December 2008, Comau and

---

[1] Unless otherwise noted, all facts are taken from the ALJ's decision.

[2] At the time the Union filed the underlying charge in this case, it was affiliated with the Michigan Regional Council of Carpenters, a unit of the United Brotherhood of Carpenters and Joiners of America.

the Union held more than twenty negotiating sessions over a new collective bargaining agreement. Comau General Counsel Edward Plawecki and Director of Labor Relations Fred Begle were Comau's chief negotiators; Peter Reuter was the Union's chief negotiator. Early in the negotiations, Comau stated that it intended to seek economic concessions from the Union and that any new agreement must either be cost-neutral or reduce Comau's costs. In particular, Comau hoped to reduce its healthcare costs[3] by switching Union members from a fully paid healthcare plan under which Union members paid no healthcare costs (Old Plan) to the healthcare plan Comau used for non-unionized workers under which workers paid monthly premiums (Company Plan). Comau wanted a uniform healthcare plan for all of its employees and it reached agreements with two other unions representing Comau employees to use the Company Plan. Tr. of Hearing at 318-19, *Comau, Inc.*, Case No. 7-CA-52106 (NLRB Nov. 17, 2009) (ALJ) (Hearing Transcript).

The healthcare issue became a sticking point between Comau and the ASW. In August 2008, the Union offered to insure Union members through a Union sponsored plan (Union Plan).[4] Under the Union Plan, Union members would pay no premiums and Comau would pay a monthly per-employee contribution for each ASW member enrolled in the Union Plan. The ASW hoped that the Union Plan would allow Comau to reduce its healthcare costs without requiring ASW members to pay premiums. Comau was receptive to the Union Plan proposal but insisted on a reduction in Comau's healthcare costs as compared to its costs under the Old Plan.

---

[3] Comau's healthcare costs included providing benefits for hospitalization, medical treatment, dental care and vision care.

[4] Blue Cross/Blue Shield was the insurance carrier for all three plans—the Old Plan, the Company Plan and the Union Plan.

One of the cost issues of the Union Plan proposal involved who would pay so-called "trailing" or "trailer" costs associated with changing from the Old Plan to the Union Plan. The Old Plan was a self-insured healthcare plan under which Comau paid for each claim as it arose. That is, instead of paying its insurance carrier a fixed monthly premium, it paid the insurance carrier the cost of healthcare services it in fact incurred. Under the Union Plan, Comau would instead make fixed monthly contributions. If Comau transferred Union members to the Union Plan, Comau would continue to pay claims for healthcare services provided to Union members under the Old Plan for approximately three to six months after the transfer due to the lag time between when the claim arose and when the insurance carrier sought payment. Thus, during this period, Comau would continue to pay the monthly per-employee contribution to the Union Plan *and* pay claims under the Old Plan. The latter payments are the trailing or trailer costs.

After failing to reach an agreement on healthcare benefits and other issues, Comau declared impasse on December 3, 2008, and gave notice that same day to the Union and separately to Union members that it intended to terminate the extension of the former collective bargaining agreement and implement its last best offer on December 22, 2008. Comau's last best offer expressly stated that its implementation date was December 22, 2008, and the Company Plan was part of its terms.[5] Between December 22, 2008 and March 1, 2009, Comau, in consultation with and with assistance from the Union, took various steps necessary to roll out the Company

---

[5] In a two-page letter circulated to Union members on December 8, 2008, Comau detailed the changes it was implementing as part of its last best offer and noted that the transfer to the Company Plan would be "effective March 1 of 2009." Letter from Management to ASW Employees at 1 (Dec. 8, 2008).

Plan, including educating Union members about the enrollment options under the Company Plan, enrolling Union members and arranging for the appropriate payroll deductions.

On the same day it declared impasse, Comau "notifie[d] the Union that it [was] prepared to continue negotiations in order to agree upon and reach a successor [collective bargaining agreement]." Notice of Imposition of Last Best Offer (Dec. 3, 2008). Comau and the Union resumed negotiations on December 8, 2008. Between December 8 and March 1, 2009, the parties met approximately ten times, generally with subcommittees focused on the healthcare benefits issue. The meetings involved primarily the amount Comau would contribute per employee to the proposed Union Plan. Over the course of these meetings, the parties grew closer on Comau's per-employee contribution and, on February 20, 2009, the Union presented a proposal that matched Comau's proposed contribution amount of $835. The agreement on Comau's per-employee contribution did not resolve all differences between the parties regarding healthcare benefits, however, and the parties remained divided over whether to break down the contribution amount into different categories depending on an employee's family size, how to adjust Comau's contribution amount if healthcare costs increased and the duration of the agreement.

As set forth in Comau's last best offer, the Company Plan went into effect on March 1. Nevertheless, on March 20, the full bargaining committees of both parties met as they had yet to agree on a new collective bargaining agreement. At the meeting, Comau proposed that the Union pay all trailing costs associated with transitioning to the proposed Union Plan. Shortly after Comau made its proposal, the parties adjourned the meeting and held no further negotiating sessions.

Earlier, on March 5, the Union filed its first ULP charge

resulting from Comau's unilateral implementation of its last best offer. In a subsequent amendment, the Union amplified its charge,[6] alleging that on "[a]bout December 22, 2008, [Comau] unilaterally changed employees' terms and conditions of employment by implementing its 'last best offer,' without having reached good-faith impasse." Amended Charge Against Employer, Case No. 7-CA-51886 (NLRB Mar. 24, 2009). After an investigation, the Board's Regional Director dismissed the charges. The Union appealed the dismissal. On August 31, 2009, the Board General Counsel (General Counsel) denied the appeal, stating that:

> Regarding the Employer's December 22, 2008 implementation of terms and conditions of employment for unit employees represented by the Union, the evidence established that the parties were at a lawful impasse when the implementation occurred.

Letter from Ronald Meisburg, General Counsel, NLRB, to Edward J. Pasternak (Aug. 31, 2009) (General Counsel Letter).

On May 19, 2009, the Union filed the ULP charge against Comau that underlies this case. The second charge originally alleged only that Comau had bargained in bad faith by having proposed on March 20 that the Union pay trailing costs, failed to provide requested financial information and refused the Union's request to continue negotiations. It made no mention of Comau's implementation of the Company Plan.

---

[6] In its original charge, the Union alleged that Comau "violated [section] 8(a)(5) of the Act by unilaterally implementing changes in termination procedures, health benefits and other terms and conditions of employment prior to impasse." Charge Against Employer, Case No. 7-CA-51886 (NLRB Mar. 5, 2009).

On July 28, 2009, however, the Union amended the second charge to include the allegation that Comau "bargained in bad faith by . . . [u]nilaterally implementing a new health insurance plan about March 1, 2009, in the absence of bona fide bargaining impasse." Amended Charge Against Employer, Case No. 7-CA-52016 (NLRB July 28, 2009). The Regional Director filed a complaint against Comau based on the ASW's second ULP charge, including its allegation regarding the implementation of the Company Plan.

After conducting a hearing, an ALJ concluded that Comau's unilateral implementation of the Company Plan constituted an unfair labor practice in violation of section 8(a)(1) and (5) of the NLRA.[7] *See Comau, Inc.*, 2010 WL 3285364 (NLRB May 20, 2010) (ALJ). In reaching his conclusion, the ALJ determined that Comau implemented the Company Plan on March 1, 2009 and that no impasse existed on that date. The Board affirmed, adopting the ALJ's rulings, findings and order with minor exceptions not relevant here. *See Comau*, 356 N.L.R.B. No. 21, 1 & n.5. Comau timely filed a petition for review and the Board filed a cross-application for enforcement.

## II.

"[Our] review of NLRB decisions is deferential" and we will vacate a Board decision "only if the Board's factual findings are not supported by substantial evidence, or the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." *Pirlott v. NLRB*, 522 F.3d 423, 432 (D.C. Cir. 2008) (internal quotation marks and

---

[7] The ALJ dismissed the charges that Comau had engaged in unfair bargaining by proposing that the Union pay trailing costs and by failing to grant its healthcare subcommittee the authority to enter into a binding agreement. The Board left the dismissal intact and those charges are not before us.

citation omitted). "The Board cannot 'ignore its own relevant precedent but must explain why it is not controlling.' " *Manhattan Ctr. Studios, Inc. v. NLRB*, 452 F.3d 813, 816 (D.C. Cir. 2006) (quoting *B B & L, Inc. v. NLRB*, 52 F.3d 366, 369 (D.C. Cir. 1995)). "Where an agency departs from established precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious." *Pirlott*, 522 F.3d at 432 (internal quotation marks and citation omitted).

The Board concluded that Comau violated section 8(a)(5) and (1) of the Act by unilaterally implementing the Company Plan on March 1, 2009, at which time Comau and the Union were not at impasse. Section 8(a)(5) of the Act makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees."[8] 29 U.S.C. § 158(a)(5). An employer violates its duty under section 8(a)(5) to bargain collectively with the representative of its employees "if, absent a final agreement or a bargaining impasse, he unilaterally imposes changes in the terms and conditions of employment."[9] *TruServ Corp. v. NLRB*, 254 F.3d 1105, 1113 (D.C. Cir. 2001).

If parties reach a bargaining impasse, however, "an

---

[8]    Mandatory areas of collective bargaining include "wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d). Comau acknowledges that the healthcare benefits at issue are a mandatory area of collective bargaining under the Act. *See Comau*, 356 N.L.R.B. No. 21, 8 n.18.

[9]    Section 8(a)(1) prohibits an employer from " 'interfer[ing] with, restrain[ing], or coerc[ing] employees in the exercise' of their statutory right to bargain collectively." *S. Nuclear Operating Co. v. NLRB*, 524 F.3d 1350, 1356 n.6 (D.C. Cir. 2008) (quoting 29 U.S.C. § 158(a)(1)) (brackets added). "A violation of [s]ection 8(a)(5) is also a violation of [s]ection 8(a)(1)." *Id*.

employer does not violate the [Act] by making unilateral changes that are reasonably comprehended within his pre-impasse proposals."[10] *Serramonte Oldsmobile, Inc. v. NLRB*, 86 F.3d 227, 232 (D.C. Cir. 1996) (quoting *Am. Fed'n of Television & Radio Artists v. NLRB*, 395 F.2d 622, 624 (D.C. Cir. 1968)). "The rationale for this rule is that the employer's unilateral imposition of the final offer breaks the impasse and therefore encourages future collective bargaining. It moves the process forward by giving one party, the employer, economic leverage."[11] *Mail Contractors of Am. v. NLRB*, 514 F.3d 27, 32 (D.C. Cir. 2008) (internal quotation marks and citation omitted). An impasse must exist at the time an employer implements a unilateral change. *See Richmond Elec. Servs.*, 348 N.L.R.B. 1001, 1004 (2006) ("if the Union broke the bargaining impasse after [the employer declared impasse]," employer's subsequent "unilateral implementation of its bargaining proposals would have been unlawful"); *Jano Graphics Inc.*, 339 N.L.R.B. 251, 251 (2003) (unilateral change violates section 8(a)(5) and (1) unless "there was . . . impasse on . . . the date of . . . unilateral implementation").

The issue here is not *whether* an impasse existed: the Board does not dispute that an impasse existed on December

---

[10] "A bargaining impasse . . . occurs when good faith negotiations have exhausted the prospects of concluding an agreement" and "the parties . . . have reached that point of time in negotiations when [they] are warranted in assuming that further bargaining would be futile." *TruServ Corp.*, 254 F.3d at 1114 (internal quotation marks and citation omitted).

[11] Once an employer unilaterally implements changes after reaching impasse, the changes "become terms and conditions of employment that the employer may not unilaterally change without first bargaining with the union to impasse." *Cox Ohio Publishing*, 354 N.L.R.B. No. 32, 3 (June 5, 2009).

22, 2008,[12] and Comau does not contest the Board's finding that no impasse existed on March 1, 2009. Instead, the issue is the date on which Comau unilaterally implemented the Company Plan: on December 22—when an impasse existed— or on March 1—when no impasse existed. We think it is clear that Comau implemented its last best offer on December 22. In notices dated December 3, 2008, Comau announced to the Union and to the Union members its decision to implement its last best offer on December 22. It informed the Union that "[Comau] shall impose its last best offer effective at 12:02 a.m. on December 22, 2008," Notice of Imposition of Last Best Offer (Dec. 3, 2008), and it also informed ASW members that "[e]ffective at 12:02 a.m. on December 22, 2008, the terms and conditions [of the last best offer] will be imposed and will be part of the terms and conditions under which you work," Notice to ASW-Represented Employees (Dec. 3, 2008). Moreover, the copy of the last best offer that Comau provided the Union and its members expressly recited that the offer's "Implementation Date" was "December 22, 2008."[13] Imposed Last Best Offer, Automated Systems Workers (ASW) (Dec. 3, 2008) (Imposed Last Best Offer).

The Company Plan was also unquestionably one of the terms and conditions implemented pursuant to Comau's last best offer. Article 10 of the offer specifically addressed "Hospitalization, Medical, Dental, and Vision Care" and it

---

[12] In explaining his rejection of the Union's first ULP charge against Comau, the General Counsel stated that "the evidence established that the parties were at a lawful impasse when the implementation occurred [on December 22, 2008]." General Counsel Letter.

[13] Regarding the Union's first ULP charge filed on March 5, the General Counsel had likewise noted Comau's "December 22, 2008 implementation of terms and conditions of employment for [ASW members]." General Counsel Letter.

provided details about the Company Plan such as premium amounts and available coverage for dependents. Imposed Last Best Offer at 21-28. Article 10.09 was entitled "Blue Cross Medical Coverage Plans (Effective March 1, 2009)" and it provided that "[a]ll regular full time ASW employees who have been with [Comau] ninety (90) days or more will be eligible to elect medical coverage under the plans [available pursuant to Company Plan]." *Id*. at 23-24.

In its notice to ASW members dated December 8, Comau informed them that, while some changes in its last best offer were "effective December 22, 2008," "the effective date of [the] change [to the Company Plan] will be March 1 of 2009." Letter from Management to ASW Employees at 1 (Dec. 8, 2008). Despite the different "effective" dates, Comau was clear that the changes were "being implemented" as part of its last best offer, which, as noted above, expressly provided for implementation on December 22, 2008. *Id*. The different "effective" dates merely reflected the fact that the mechanics of transferring ASW members from the Old Plan to the Company Plan required extensive preparation. As the ALJ found, between December 2008 and March 1, 2009, Comau was required to take "a number of steps to make it possible to switch the unit employees from [the Old Plan] to the [Company Plan]." *See Comau*, 356 N.L.R.B. No. 21, 4. Despite the required additional steps and the parties' continued negotiations after December 22, Comau was explicit that it was implementing the Company Plan—along with the other terms contained in its last best offer—on December 22. Even Peter Reuter, the Union's chief negotiator, recognized that the required delay in the Company Plan's effective date did not alter the implementation date of the change. At the hearing before the ALJ, he testified that because "the health insurance changes contained in Comau's 12/22/08 *implemented offer* had an effective date of 3/1/09," Comau and the Union continued bargaining on healthcare

changes "between *implementation* and 3/1/09." Hearing Transcript at 193-94.

Based on these facts, we conclude that the change to the Company Plan was "reasonably comprehended" in Comau's last best offer and that Comau unilaterally implemented the offer—including the change to the Company Plan—on December 22, 2008. *See Brooks Bros.*, 261 N.L.R.B. 876, 881-83 (1982) (employer "implement[ed] . . . a program of dental insurance immediately before [a] November 21 [union] election" even though program was not "effective [until] January 1"); *cf. NLRB v. Plainville Ready Mix Concrete Co.*, 44 F.3d 1320, 1333-34 & n.11 (6th Cir. 1995) (if employer presents negotiating proposal "as a comprehensive, integrated whole," it is "reasonably comprehended" proposal "[will] be implemented in its entirety") (internal quotation marks omitted). Accordingly, the Board's finding that Comau committed a ULP when it unilaterally implemented the Company Plan was "arbitrary and capricious" because all parties agree that Comau and the Union *were* at impasse on December 22. *Mail Contractors of Am.*, 514 F.3d at 34-36 (Board's finding that employer committed ULP by unilaterally implementing change after impasse "was arbitrary and capricious"). "[A]n employer does not violate the [Act] by making unilateral changes that are reasonably comprehended within his pre-impasse proposals" once the parties reach impasse. *Serramonte Oldsmobile*, 86 F.3d at 232; *see also Cox Ohio Publishing*, 354 N.L.R.B. No. 32, 3 ("It is well settled that after bargaining to an impasse . . . an employer does not violate the Act by making unilateral changes that are reasonably comprehended within his pre-impasse proposals." (internal quotation marks and citation omitted; ellipsis in original)).

The Board's contrary conclusion results from its finding that Comau did not "implement" the Company Plan until it

"became effective" on March 1, 2009. The Board adopted the ALJ's reasoning, including his "point of no return" phraseology that "[a] change in terms of employment cannot reasonably be viewed as 'implemented' for unit employees at a time when that change is not being applied to a single one of those employees and the employer has not passed a 'point of no return' committing it to making the change at all." *Comau*, 356 N.L.R.B. No. 21, 10. According to the ALJ, "what [Comau] did in December 2008 regarding healthcare amounted to an announcement of intent to implement the [Company] [P]lan on March 1—not the implementation of such a plan." *Id*. The Board takes the same position before us. *See* Respondent's Br. 29. Earlier Board decisions, however, recognize that an employer *can* implement a change in employment terms and conditions *before* the change is effective or otherwise "being applied to a single one of [its] employees." *See ABC Auto. Prods., Corp.*, 307 N.L.R.B. 248, 249-50 (1992) ("the unilateral change was effectively implemented when it was announced" even though announcement occurred four days before change became effective); *Brooks Bros.*, 261 N.L.R.B. at 881-83; *cf. Daily News of L.A.*, 315 N.L.R.B. 1236, 1237-38 (1994) ("[W]henever the employer *by promises* or by a course of conduct has made a particular benefit part of the established wage or compensation system, then he is not at liberty unilaterally to change this benefit either for better or worse during . . . the period of collective bargaining." (emphasis added)).

The ALJ, whose reasoning and supporting authority the Board adopted without amplification, relied on two cases—*Bryant & Stratton Business Institute*, 327 N.L.R.B. 1135 (1999), and *PRC Recording Co.*, 280 N.L.R.B. 615 (1986)—to support his "point of no return" theory but neither does so. In *PRC Recording Co.*, the Board found that assuming *arguendo* an impasse existed, it was "*instantaneously* broken

by the continuation of further bargaining" and therefore did not justify the employer's "initiation" of a change that it kept secret both from the union and from its employees. 280 N.L.R.B. at 640 (emphasis added). In *Bryant & Stratton*, the ALJ concluded that an employer "stat[ing] that it '*intends*' to implement [a change]" at a future date is different from the employer "say[ing] that the [change] was implemented immediately." 327 N.L.R.B. at 1149 (emphasis added). Neither case suggests that a unilateral change can be "implemented" only when it becomes "effective." And, importantly, neither suggests that a change not *entirely* effective on implementation must pass through stages of implementation until it reaches a stage of irreversibility before the Board will sanction it. And as the Board's counsel conceded at oral argument, "no . . . specific case" supports the ALJ's "point of no return" articulation. *See* Oral Argument Tr. at 24-25.[14]

Moreover, the Board's application of the "point of no return" test would lead to an arbitrary outcome at odds with the purpose of the Act. For example, as Comau points out, if an employer implemented a last best offer providing for wage increases at set future intervals, the "point of no return" analysis, carried to its logical conclusion, would suggest that the employer could later rescind the promised wage increases if bargaining resumed in the interim. After all, wage increases due to take place in the future are no more "past the point of no return" than a new health insurance plan set to take effect at some future date.

---

[14] Indeed, once implementation is announced, imposing a "point of no return" condition could undermine the purpose of impasse by negating the employer's "economic leverage" during the time needed to effect the change and thus inhibit its ability to "break[] the impasse and . . . encourage[] future collective bargaining." *Mail Contractors of Am.*, 514 F.3d at 31-32.

The ALJ, however, attempted to distinguish the two situations but we find his reasoning wholly unpersuasive. He cited *Daily News* to support his proposition that "*if* [an] employer has implemented [a] new wage plan" under which "raises . . . will not be triggered until later dates," "it has passed the point of no return and cannot simply choose to ignore its obligation to provide the raises when the triggering dates arrive." *Comau*, 356 N.L.R.B. No. 21, 10 n.21 (emphasis added). The ALJ is of course correct that *if* an employer implements such a plan, it cannot withhold future pay raises. But he *assumes* the answer to the underlying question at the heart of this case: namely, *when* does an employer implement a change? If a change is considered implemented only when it becomes effective, then promised wage increases would never be safe from future rescission—a result the ALJ refused to countenance. If, on the other hand, the new wage plan can be considered "implemented" even if specific pay raises "will not be triggered" until some future date, *id.*, then there is no reason for treating the Company Plan at issue in this case any differently. In other words, the ALJ's own reasoning with respect to the wage-plan hypothetical compels the conclusion that Comau's healthcare plan was fully "implemented" on December 22, 2008, nothwithstanding the later "triggering date[]" for its specific healthcare changes. *Id.*

For the foregoing reasons, we grant Comau's petition for review and deny the Board's cross-application for enforcement.[15]

*So ordered.*

---

[15] Given our decision, we do not reach Comau's other claims regarding the binding effect of the General Counsel's findings and the scope of the Board's remedy.