# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 14, 2012        Decided June 21, 2016

No. 11-1212

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

v.

SOUTHWEST REGIONAL COUNCIL OF CARPENTERS AND
GARNER/MORRISON LLC,
PETITIONERS

———

Consolidated with 11-1445, 11-1446

———

On Petitions for Review and Cross-Application for
Enforcement of Orders of the National Labor Relations Board

———

*James A. Bowles* argued the cause for petitioners. With him on the brief was *Daniel M. Shanley*.

*Nina Schichor*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Julie Broido*, Supervisory Attorney. *Jeffrey W. Burritt*, Attorney, entered an appearance.

Before: GRIFFITH, *Circuit Judge*, WILLIAMS and SENTELLE, *Senior Circuit Judges*.

GRIFFITH, *Circuit Judge*: This matter comes before us on petitions for review and cross-application for enforcement of orders of the National Labor Relations Board finding that both the company and the union committed unfair labor practices. After oral argument, we held this case in abeyance pending the Supreme Court's consideration of the validity of the President's recess appointments to fill vacancies on the Board in *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014). Member Becker, who was on the Board panel in this case, had been appointed to the Board by the President during a 17-day intra-session recess of the Senate. Following the Supreme Court's decision, this court held that Becker's appointment was valid. *See Mathew Enter. v. NLRB*, 771 F.3d 812, 814 (D.C. Cir. 2014). Following that decision, we removed this case from abeyance. We now hold that the Board's orders failed to provide a reasoned justification for departing from precedent and we grant the petitions for review, vacate the orders, and remand.

I

Garner/Morrison, LLC (G/M) is a construction company that provides drywall installation and painting services for office buildings and commercial construction sites. Founded in November 2003 by its current owners, Cliff Garner, his son Gary Travis Garner, and Chris Morrison, G/M hired its first employee, a carpenter, in December 2003 and immediately entered into a collective-bargaining agreement with the Southwest Regional Council of Carpenters (the Carpenters Union). The agreement established the Carpenters Union as the bargaining representative of any carpenter hired by G/M, as well as any painters or tapers the company employed unless

they were covered by a separate agreement with the International Union of Painters and Allied Trades (the Painters Union).

In April 2004, G/M hired painters and tapers who were not already covered by a collective-bargaining agreement. In short order, G/M entered into an agreement with the Painters Union that covered those new hires. The agreements were set to last until March 31, 2007. As that date approached, G/M, which had grown dissatisfied with the Painters Union, began to explore whether the Carpenters Union would cover its painters and tapers. Representatives of the Carpenters Union told the management of G/M that once the company's agreements with the Painters Union expired, the Carpenters Union, pursuant to its agreement with G/M, would automatically offer health and pension benefits to the newly hired painters and tapers. G/M decided to let its collective-bargaining agreements with the Painters Union expire and asked the Carpenters Union to meet with the company's painters and tapers.

The Carpenters Union scheduled a meeting for April 2, 2007, after working hours, in a hotel conference room. The Union chose the time and place of the meeting and paid for the conference room. G/M encouraged painters and tapers to go to the meeting, but in no sense was their attendance mandatory. All but one or two of the 25 or so painters and tapers at G/M attended. Also present were 15 or 16 representatives from the Carpenters Union, three employees from a health insurance company that worked with the Carpenters Union, the three owners of G/M, and one of their superintendents.

The conference room where the meeting was held was large—about 75 feet long by 50 feet wide. At the front of the room, several representatives of the Carpenters Union sat at a table. G/M's three owners and a superintendent sat in the first

row of seats. The painters and tapers sat in rows behind them. At two tables at the back of the room—some 65 feet away from the front table—sat other representatives of the Carpenters Union and employees of the health insurer.

As the meeting began, G/M owner Morrison told the painters and tapers to listen to the Carpenters Union's presentation, which the company thought was "a good deal." It was the view of the company, he explained, that the Carpenters Union was a "better choice" for the employees than the Painters Union and "probably the way we want to go." Morrison's comments endorsing the Carpenters Union took no more than a few minutes. Following his remarks, representatives of the Carpenters Union made their case for why the painters and tapers should join with them, highlighting the insurance benefits provided by the Carpenters Union, as well as the wages the painters and tapers would receive if they joined. They also explained how to pay dues. Their presentation took about an hour, including time for questions and answers. Finally, they told the painters and tapers that there would be a sign-up in the back of the conference room. At that point, the painters and tapers went to the back of the room where agents from the health insurance company gave them information on the benefits packages available through the Carpenters Union, and Carpenters Union representatives urged the employees to sign union authorization cards to signal that they wanted to "designate the [Carpenters] [U]nion as their collective-bargaining representative." *Pa. State Educ. Ass'n-NEA v. NLRB*, 79 F.3d 139, 143 (D.C. Cir. 1996).

During this entire time, the G/M owners and superintendent stayed at the front of the room. They did not join their employees in the back of the room with the representatives of the Carpenters Union and the insurance company. From about 60 or 70 feet away, the owners said that

they could see the employees' movements in the back of the room, but they could not hear their conversations or see whether they were signing authorization cards. After the painters and tapers had spent several minutes with them in the back of the room, the representatives of the Carpenters Union walked to the front of the room and gave Morrison and fellow owner Travis Garner signed union authorization cards from the majority of G/M's painters and tapers. They asked for recognition of the Carpenters Union as the exclusive bargaining agent of G/M's painters and tapers. *See* 29 U.S.C. § 159(a). The owners of G/M signed an agreement on the spot.

That very day, the Painters Union filed election petitions with the Board seeking to represent G/M's painters and tapers once again. The Painters Union faxed the petitions to G/M's office at the same time representatives of the Carpenters Union were meeting with G/M's owners and employees in the conference room of the hotel. The G/M owners did not see the petitions until they returned from the meeting, where they had already signed an agreement that the Carpenters Union would represent the painters and tapers.

The Painters Union filed an unfair labor practice charge with the Board, and the General Counsel issued a complaint alleging that G/M violated section 8(a)(1) of the NLRA by engaging in unlawful surveillance of the painters and tapers at the April 2 meeting. An employer's surveillance of employees is unlawful under section 8(a)(1) where it "interfere[s] with, restrain[s], or coerce[s] employees in the exercise" of their collective-bargaining rights. 29 U.S.C. § 158(a)(1); *see also Gold Coast Rest. Corp. v. NLRB*, 995 F.2d 257, 266 (D.C. Cir. 1993), *amended*, No. 91-1533, 1993 WL 444597 (D.C. Cir. Oct. 25, 1993). The complaint also alleged that G/M violated section 8(a)(2) of the NLRA, which prohibits an employer from unlawfully assisting a union, by being present at the

meeting while the Carpenters Union collected authorization cards and unlawfully recognizing the Carpenters Union as the bargaining representative of the painters and tapers. *See* 29 U.S.C. § 158(a)(2). Finally, the complaint alleged that the Carpenters Union improperly accepted G/M's unlawful recognition and assistance. *See id.* § 158(b)(1)(A).

After a two-day hearing, the ALJ recommended dismissing the complaint. As to the allegation of unlawful surveillance, the ALJ found that the presence of the company's owners at the meeting "had no tendency whatsoever toward interfering with, restraining, or coercing the painters and tapers in the exercise of their rights" under section 8(a)(1). As to the section 8(a)(2) charge, the ALJ found "no evidence whatsoever of illegal assistance" by G/M because the Carpenters Union paid for the hotel and ran the meeting. And given that G/M did not provide any illegal assistance, the ALJ concluded that the Carpenters Union could not have unlawfully accepted such assistance under section 8(b)(1)(A).

The Painters Union and the General Counsel filed exceptions to the ALJ's decision. A two-member panel of the Board reversed the ALJ, concluding that G/M had engaged in unlawful surveillance and had provided unlawful assistance to the Carpenters Union, which the Carpenters Union unlawfully accepted. *Garner/Morrison, LLC*, 353 N.L.R.B. No. 78 (2009). G/M and the Carpenters Union petitioned for review in this court. In light of the Supreme Court's decision in *New Process Steel, L.P. v. NLRB*, 130 S. Ct. 2635 (2010), which held that Board panels with only two members lack authority to issue decisions, we remanded the case to the Board for decision by a three-member panel.

On remand, a panel of Chairman Liebman and members Becker and Pearce unanimously adopted the Board's previous

decision, finding that the critical evidence that established a violation of section 8(a)(1) was the G/M owners' "presen[ce] in the room while the employees were solicited to sign the Carpenters' documents and while employees responded to that solicitation by proceeding to the back of the room where documents were signed." *Garner/Morrison, LLC*, 356 N.L.R.B. No. 163 (2011) (citing *Morehead City Garment Co.*, 94 N.L.R.B. No. 45 (1951)). The Board concluded that, "even assuming the [G/M] executives could not see the exact documents that were signed," their presence "constituted unlawful surveillance for the purpose of influencing employees to switch their allegiance to the Carpenters." *Id*. And, due to "the unlawful surveillance that tainted acquisition of a majority" of employees supporting the Carpenters Union, the Board concluded that G/M unlawfully assisted the Carpenters Union, which unlawfully accepted that help. To remedy these unfair labor practices, the Board issued an order that G/M cease recognition of the Carpenters Union as the representative of the painters and tapers. *Id.*

G/M and the Carpenters Union filed a motion for reconsideration, arguing that the Board's determination had ignored its holding in *Coamo Knitting Mills, Inc.*, 150 N.L.R.B. No. 35 (1964), which was on point and controlling. The Board thought otherwise, concluding that *Coamo* was a much different case.

G/M and the Carpenters Union petition for review and the Board cross-applies for enforcement of its orders. We have jurisdiction under 29 U.S.C. § 160(e), (f).

II

We give "a very high degree of deference to administrative adjudications by the NLRB." *Bally's Park*

*Place, Inc. v. NLRB*, 646 F.3d 929, 935 (D.C. Cir. 2011). But our deference is not absolute. We will overturn the Board if its "factual findings are not supported by substantial evidence," or if it "acted arbitrarily or otherwise erred in applying established law to the facts of the case." *Comau, Inc. v. NLRB*, 671 F.3d 1232, 1236 (D.C. Cir. 2012). A decision of the Board that "departs from established precedent without a reasoned explanation" is arbitrary. *Id.* Of course, the Board need not address "every conceivably relevant line of precedent in [its] archives," but it must discuss "precedent directly on point." *Lone Mountain Processing, Inc. v. Sec'y of Labor*, 709 F.3d 1161, 1164 (D.C. Cir. 2013).

G/M and the Carpenters Union argue that the Board's decision was arbitrary and capricious because the Board did not provide a reasoned justification for its departure from *Coamo Knitting Mills*. We agree.

In *Coamo*, the General Counsel alleged that the company had provided unlawful assistance and support to a union that the union unlawfully accepted. 150 N.L.R.B. No. 35 at 583, 589. The charges stemmed in part from a meeting of the union and the company's employees. The Board found that the day before the meeting, the company's vice president urged his employees to join the union. At the meeting, the vice president introduced the union representative, then left, but another member of management stayed. After a union representative made his pitch to the employees to join the union, his associates gave them authorization cards. Enough employees signed the authorization cards to gain majority support for the union. All this took place in the presence of a member of company management. *Id.* at 581-82, 586.

At the trial, the examiner (now called an ALJ) determined that the company and the union violated NLRA section 8, in

part because the presence of management at the meeting "necessarily had a coercive effect" on the employees. *Id.* at 589. The Board, however, disagreed. The representative of management who stayed at the meeting testified that he could not see the employees signing cards. Another witness corroborated his testimony. *Id.* at 581-82. Further, company management "made no attempt to ascertain which employees even attended the meeting." *Id.* at 582. According to the Board, the "mere presence" of a member of management was not coercive and therefore did not violate section 8. *Id.* at 582-83.

*Coamo* closely resembles this case. In both, the union held a meeting for the company's employees. In both, management made statements in support of the union. In both, management was present while union representatives spoke to employees about why they should join the union and urged the employees to sign union authorization cards. And in both, the signing of those cards led to majority support for the union. Importantly, in neither case did the Board conclude that the company representative(s) saw what the employees were signing.

Not only are the facts in *Coamo* similar to the facts here, but the legal issues in *Coamo* mirror those here. In both cases, the Board examined whether the presence of management at a union meeting where employees signed authorization cards violated section 8(a)(1) and (a)(2). In both cases, the Board looked at whether that conduct resulted in the union accepting unlawful assistance under section 8(b)(1)(A).

The similarities between *Coamo* and the present case are "significant enough" that the Board needed to provide a reasoned explanation why *Coamo* "does not apply, or why departure from [*Coamo*] is warranted." *Lone Mountain*, 709 F.3d at 1164. The Board attempted to distinguish this case from *Coamo* on the ground that *Coamo* did not involve a claim

of unlawful surveillance. Although the Board in *Coamo* never used the phrase "unlawful surveillance," that is a distinction without a difference. "Unlawful surveillance" is not a separate statutory violation or cause of action in the NLRA. Section 8 of the NLRA does not mention "unlawful surveillance"; instead it prohibits an employer from "interfer[ing] with, restrain[ing], or coerc[ing] employees in the exercise" of their protected rights, 29 U.S.C. § 158(a)(1), and from "dominat[ing] or interfer[ing] with the formation or administration of any labor organization," *id.* § 158(a)(2). As used by the Board and this court, "unlawful surveillance" is simply shorthand for a type of conduct that "interferes with, restrains or coerces the employee in the exercise of protected organizational activities." *Gold Coast*, 995 F.2d at 266. The Board evaluated nearly identical conduct and the same legal questions here and in *Coamo*. The only material difference was the result. Without any other justification for distinguishing *Coamo*, the Board's decision cannot stand.

In its brief to this court, the Board offers new reasons for not following *Coamo* in this case. The Board contends that the facts here are "starkly different" from those in *Coamo* because G/M "corralled its employees to an off-site meeting" where all the G/M owners "could watch as the Carpenters solicited employees to sign cards." Resp't Br. at 29. Even if the Board had explained the relevance of these alleged factual differences, we cannot address this argument because it did not appear in the Board's orders below. We "may consider only the Board's own reasons, not the rationalizations of counsel." *Charlotte Amphitheater Corp. v. NLRB*, 82 F.3d 1074, 1080 (D.C. Cir. 1996) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943)). The Board's order denying reconsideration relies solely on the absence of a claim of unlawful surveillance in distinguishing *Coamo*, not on any factual differences between the cases. Accordingly, we "reject[ ] the temptation to supply

reasons to support the Board's decision that the Board itself has not offered." *Detroit Newspaper Agency v. NLRB*, 435 F.3d 302, 311 (D.C. Cir. 2006). We note, however, that nothing precludes the Board from making such a distinction on remand if supported by the record. *See Lone Mountain*, 709 F.3d at 1164.

G/M and the Carpenters Union also assert that the Board's decision was not based on substantial evidence and the Board's remedy was improper. Because we hold that the Board did not adequately distinguish *Coamo* and grant the petitions for review on that ground, we need not reach the remaining arguments.

III

We grant the petitions for review, deny the Board's cross-application for enforcement, vacate the Board's orders, and remand.